Carl **SCHNELL** and the **Griffith Laboratories, Inc.**, an Illinois corporation, Plaintiffs,

v.

The **ALLBRIGHT–NELL COMPANY**, an Illinois corporation, and **Peter Eckrich and Sons, Inc.**, an Indiana corporation, Defendants.

Civ. A. No. 61 C 1979. (Consolidated with Civ. A. 60 C 62.)

United States District Court
N. D. Illinois, E. D.
Nov. 13, 1963.

---

Charles J. Merriam and Norman M. Shapiro, of Merriam, Smith & Marshall, Chicago, Ill., for plaintiffs.

Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for defendants.

AUSTIN, District Judge.

The Parties.

1. Plaintiff, Carl Schnell (referred to hereafter as "Schnell"), is a citizen of Germany, residing at Winterbach near Schorndorf, Germany. Plaintiff, The Griffith Laboratories, Inc. (referred to hereafter as "Griffith"), is an Illinois corporation, having its principal office and place of business in the City of Chicago, Illinois. Defendant, The Allbright-Nell Company (referred to hereafter as "Allbright-Nell" or "Anco"), is a corporation of the State of Illinois, having its principal office and place of business in the City of Chicago, Illinois. Defendant, Peter Eckrich and Sons, Inc. (referred to hereafter as "Eckrich"), is an Indiana corporation having its principal office and place of business in the City of Fort Wayne, Indiana.

PX–87.

Ownership of Patents in Suit.

2. Plaintiffs are and since the respective dates of issuance have continuously been joint owners of United States Letters Patents 2,840,318, 2,906,310, 2,934,120, 2,934,121, and 3,044,514, and United States Letters Reissue Patents 24,683 and 24,764, and all rights of recovery for all infringements thereof. All of these patents were duly and legally issued on inventions made by Carl Schnell. With the exception of Reissue Patent 24,683, these patents relate to comminuting machines that emulsify meat products. These machines are widely used by sausage manufacturers to produce new and improved meat products. Reissue Patent 24,683 relates to methods for emulsifying meat products, which methods are also widely used by sausage manufacturers.

PX–87.

The Actions.

3. Plaintiffs, Schnell and Griffith, brought the following patent infringement actions against defendant, Eckrich, in the United States District Court for the Northern District of Indiana, Fort Wayne Division:

C. A. 1128, filed 2/13/59, involving U. S. Letters Patents 2,840,318 and 2,842,177;

C. A. 1184, filed 9/30/59, involving U. S. Letters Patent 2,906,310;

C. A. 1211, filed 2/8/60, involving U. S. Letters Reissue Patent 24,764 (a reissue of Patent 2,842,177); and

C. A. 1229, filed 4/26/60, involving U. S. Letters Patents 2,934,120 and 2,934,121.

PX–88, PX–89.

4. On January 14, 1960, defendant, Allbright-Nell, brought a declaratory judgment action against plaintiffs, Schnell and Griffith, in the United States District Court for the Northern District of Illinois, Eastern Division, involving U. S. Letters Reissue Patent 24,683 (a reissue of U. S. Letters Patent 2,836,825) and U. S. Letters Reissue Patent 24,764 (a reissue of U. S. Letters Patent 2,842,177). This action was identified as Civil Action No. 60-C-62.

PX–88, PX–89.

5. On November 21, 1961, plaintiffs brought the above-entitled Civil Action No. 61-C-1979 against defendants alleging infringement of each of U. S.

Letters Patents 2,840,318, 2,906,310, 2,-934,120 and 2,934,121, and U. S. Letters Reissue Patents 24,683 and 24,764.

PX–89.

6. Civil Actions Nos. 60-C-62 and 61-C-1979 were consolidated, after which plaintiffs and defendant, Eckrich, stipulated for the dismissal, without prejudice, of the patent infringement suits in the Northern District of Indiana, referred to in Finding 3, above. This stipulation provides:

(a) The dismissal shall not give rise to the defense of estoppel or laches or statute of limitations with respect to the causes of actions set forth in the complaints in Civil Actions Nos. 60-C-62 and 61-C-1979, unless such defenses would have been available without such dismissal; and

(b) The dismissal shall not be considered a voluntary dismissal under Rule 41(a) of the Federal Rules of Civil Procedure.

PX–89.

7. The original complaint in Civil Action No. 61-C-1979 was revised by an order of this Court, dated July 17, 1962. The revised complaint brought into suit plaintiffs' U. S. Letters Patent 3,044,-514, issued on July 17, 1962.

Claims in Suit.

8. Plaintiffs asserted that defendants, or either of them, infringe the following patents (PX–2), including the claims identified with respect thereto:

Patent 2,840,318: Claim 2;
Patent 2,906,310: Claims 1–8;
Patent 2,934,120: Claims 1 and 2;
Patent 2,934,121: Claims 1–24;
Re. Patent 24,764: Claims 1–3 and 5–15;
Patent 3,044,514: Claims 1–15, 17 and 18; and,
Re. Patent 24,683: Claims 1–16.

Sausage Industry.

9. The sausage industry is based on the utilization of the portions of the carcasses of cattle or hogs which cannot be used as steaks or hams or pork chops. This material is known in the industry as trimmings, and is the portion of the carcass that is left over when the prime cuts are removed. Many types of trimmings contain gristle and/or hard meat (e. g., rinds and offal materials) which nonetheless have high protein or nutritional value when suitably cut.

Cypser 47, 48, 53, 54; Swanson 90, 91, 94–98, 107–110; PX–7; Turner 147–150, 165; PX–82.

10. Sausage emulsions were produced almost entirely by use of machines like the Silent Cutter, or chopper as it was more often referred to. These machines were large, bulky and relatively slow, and they did not produce the quality of emulsion now available, nor did they permit the use of many nutritious portions of the carcass which could not be adequately subdivided in them.

Swanson 80–87; Cypser 47, 48, 53.

11. The Silent Cutter was a standard piece of equipment that was used by commercial sausage kitchens for many years before Schnell discovered a meat comminuting machine. It comprised a doughnut-shaped bowl that turned in a horizontal plane and a cutting zone with a series of vertically rotating blades. The mass of meat in the doughnut-shaped bowl was forced continuously into these vertically acting cutting blades. This reduced the particle size of the meat and fat products and, with the addition of moisture that was added to the mix, made a blend. The Silent Cutter caused a high temperature rise of the meat in a short period of time. This was extremely undesirable because a high temperature rise caused a marked variation in the product which in turn affected the salability of the product. Further this machine required a batch operation. The cutting blades had to be continuously kept in a sharp condition for efficient operation and the knives presented considerable danger to the operator.

Swanson 102–104; PX–5; Turner 116–117, 152–154; Cypser 76; PX–4.

12. With the old type of sausage production which depended upon a chopper

(e. g., Silent Cutter), the hard portions, while substantially reduced in size, oftentimes were like small particles of gravel and because of this it was necessary to eliminate the use of many types of hard trimmings which had high nutritional value and which would decrease the cost of the sausage.

Cypser 53.

13. Colloid mills were also used, to a limited extent, to comminute meat. These, too, produced a high temperature rise of the meat. Further, their tearing action produced an undesirably stringy product.

Swanson 86–88.

14. Commercial sausage kitchens used a grinder, followed by a chopper (e. g., Silent Cutter), followed by stuffing means and then treatment in a smoke house. The grinder was used to break down the large pieces of meat product into a size suitable for further blending and cutting in the chopper, where moisture and seasoning were added.

Cypser 46; Swanson 82; PX-4; PX-8; DX-92.

15. This finished emulsion then went to stuffing apparatus which placed it into casings of a size suitable for frankfurters or bologna and from there the meat was further cooked or smoked in the smoke house to produce the finished sausage.

Cypser 46; Swanson 82; PX-4; PX-8.

Schnell's Discoveries.

16. Schnell discovered that he could cut rinds and offal materials in his early meat comminuting machines in the raw, uncooked state and still be able to produce a better emulsion than had been previously obtained with these materials in other equipment.

DX-271A, pages 14, 30, 31; DX-271B, pages 136, 145; DX-271C, page 210.

17. He found that he could emulsify nutritious trimmings, including hard particles, that previously could not be used. However, with some meat products it was necessary to exert pressure upon the meat in the hopper in order to force the meat down to the rotary knives.

Turner 151, 152.

18. Later, Mr. Schnell made a further discovery of great consequence. He was the first to discover and teach that when meat ingredients were combined in a hydraulic column and propelled by a rotating knife against a perforate valve plate so that most of the material propelled to the plate would not pass through it but would be diverted back for recutting and remixing, one got an entirely new result.

Schnell 1666–70; DX-271A, page 39; DX-271F, pages 500, 501.

19. Schnell was the first to discover and teach that this action of the plate made it possible to get better cutting, better distribution and greater output in spite of the fact that the hydraulic column put a tremendous drag on the motor and required a larger motor which caused more heat. The greatly increased output more than compensated for the extra heat produced by the large motor so that there was a lower temperature rise in the product.

Schnell 166–70; DX-271A, page 39; DX-271F, pages 500, 501; Turner 162.

20. The rate of comminution depends upon the toughness of the meat, the fluidity of the mixture and many other factors. But even with the toughest meat, the capacity of Schnell's sealed emulsifier is almost incredible. Eckrich's records show many instances of treatment of well over 500 pounds of meat per minute. With conventional high grade sausage emulsions, comminuting 200 or 300 pounds per minute is now standard with plaintiffs' and defendants' emulsifiers. The machine introduced a new problem to the industry, namely, trying to supply the machine with an adequate rate of feed material which became necessary due to the mark-

edly increased rate of comminution. This led to automation of the industry.

Turner 162; Swanson 100–102; Cypser 52; PX–92A and C–R; PX–94A–H.

21. The reason why the comminuting of material like meat is so greatly improved with the hydraulic column is theoretical in that one cannot watch what happens to an individual particle of meat. One can observe only the result in greater capacity, greater load on the motor, improved emulsification and a limited temperature increase.

Fishleigh 2790, 2810; Schmidt 3564; Turner 160–162; Swanson 100–102; Cypser 52.

22. With the hydraulic column, the pressure of the atmosphere is employed to maintain continuity of meat material in the emulsifier. The 14.7 pounds per square inch pressure of the atmosphere assures that the movement of one particle away from the knife, after being hit, pulls at least another particle into cutting position.

Schoenherr 3848–3850; Turner 442.

23. The hydraulic column is essential for most commercial operations as now practiced. The power requirements are several times greater when the hydraulic column exists, but the feeding of meat is difficult without the hydraulic column. In fact, introducing a few bubbles of air in the entrance of the comminuting chamber will normally stop any feeding of meat or at least slow it down to a point where overheating results.

Turner 160–162, 3742–3743; Cypser 71; Schnell 1666–70; DX–271A, page 39; DX–271F, pages 500–501.

24. In developing his emulsifier, Schnell discovered that certain other structures in the emulsifier afforded added advantages in comminuting meat products. Included in such structures are the particular shape of the propelling knife, the circulating surfaces that cooperate with the knife and perforate plate, and obstructing means.

DX–271A, pages 18, 19; DX–271B, page 149; DX–271C, pages 225, 233, 234.

Schnell's Discoveries Revolutionized the Sausage Industry.

25. The Schnell emulsifier revolutionized the sausage processing industry and permitted, for the first time, the sausage manufacturers to produce sausage in a continuous manner rather than in their previous batch-wise operations wherein the meat had to be manually conveyed from the grinder to the chopper and from the chopper to the stuffer. The Schnell emulsifier enabled sausage manufacturers to feed their emulsion through pipes directly into the pump-type stuffer without any handling. Manual handling of the meat was obviated and sanitation was thus improved.

Turner 162; Swanson 100–102; Cypser 52; PX–4.

26. In addition, the Schnell emulsifier enabled the sausage manufacturers to produce a better meat product, enabled them to produce this superior product at a lower per pound operating cost and displaced space-consuming and more expensive equipment. More specifically, the Schnell emulsifier:

(a) Permits the utilization of highly nutritious animal products not heretofore usable in sausage, thereby lowering the cost of the sausage;

(b) Produces a finer and more uniform emulsified product than the meat industry was able to obtain with existing equipment;

(c) Produces a more presentable and salable product; that is, a product that looks better to the average customer and a product that is more uniform in taste and consistency;

(d) Provides better utilization of equipment already existing in sausage kitchens. Sausage kitchens can now produce more in terms of pounds of product per hour than through their grinder and/or chopper;

(e) Provides savings in labor because it turns out more pounds of meat

product per hour with the same or fewer man-hours;

(f) Provides savings in floor space. The upright model of the emulsifier occupies much less floor space than the chopper, which could be eliminated; and,

(g) Reduces the need for the highly skilled personnel that was previously required. Prior to Schnell, chopping of sausage products was a highly skilled operation. The sausage maker who operated the chopper was a highly paid individual who had developed a special skill in knowing when chopping should be stopped.

Cypser 46–54, 57, 62; Swanson 90, 94–102, 107–110; Turner 162, 163–174; PX–4; PX–9.

Introduction of Emulsifiers in the United States.

27. During the period of from 1956 to the present time, the Schnell machines have been made by Schnell for Griffith and they have been sold in the U. S. by Griffith under the name "Mince Master" machines. These machines substantially correspond with the structures shown in various Schnell patents in suit.

Griffith 535; Turner 216–284; DX–271B, pages 102–106; PX–1; PX–10; PX–79; PX–81.

28. After Griffith's "Mince Master" machines were introduced and first sold in the U. S., Allbright-Nell first made and sold in the U. S. a copy of the "Mince Master" machine. This copy was later identified as the Anco "Emulsitator" machine.

R. 654, 690–691; PX–37.

29. Emulsifier such as Griffith's "Mince Master" machines and Allbright-Nell's Anco "Emulsitator" machines produce a smooth, uniform emulsion which was not obtainable under the old methods or with the old equipment, in addition to being able to emulsify materials which could not be used in the past.

Cypser 56, 57, 66, 70; Turner 163–174; PX–9.

30. In the very few years in which the emulsifiers have been available in this country, the commercial sausage industry now relies greatly upon this type of machine.

Cyprus 48, 49, 59; Turner 357–359; R. 690; PX–84.

31. Sausage manufacturers have bought "Mince Master" machines and "Emulsitator" machines because their customers would no longer accept the type of product they formerly made.

Swanson 92, 99; Cypser 55, 56; Turner 357–359; R. 690; PX–84.

32. In some instances, sausage manufacturers continue to handle their meat products through both the grinder and the chopper, and then through either a Griffith "Mince Master" machine or Anco "Emulsitator" machine. Even with this procedure, they are able to shorten both the grinding and chopping operations and obtain a savings in labor.

Swanson 100, 101; Cypser 52; PX–4; PX–9.

33. Important savings are obtained with the use of the Griffith "Mince Master" emulsifiers and Anco "Emulsitator" emulsifiers.

Cypser 48–52; Swanson 94–98; PX–7.

34. The use of Griffith "Mince Master" machines at Armour and Company, a company that makes a minimum of 2,000,000 pounds of frankfurters and bologna per week, was an important factor in converting within an eighteen month period a loss of $2,000,000 to a profit of $4,000,000 in the sausage department.

Cypser 48, 50, 51.

35. Armour spent three-quarters of a million dollars purchasing "Mince Master" machines and providing necessary installations such as electrical wiring that was not previously available. The "Mince Master" machines were credited

with saving Armour one million dollars during this period. Armour also uses Anco "Emulsitator" machines for the same purpose as its "Mince Master" machines.

Cypser 51, 52, 55, 56.

36. The ability to employ nutritious meat products not heretofore usable in sausage emulsion enabled John Morrell and Company, a manufacturer of meat products, to save as much as 4¢ per pound of sausage.

Swanson 94–98; PX–7.

History of the "Mince Master" and "Emulsitator" Machines.

37. Schnell used in 1954 a comminuting machine with a knife that rotated upon a perforate plate. This machine was used for comminuting pork rinds. In the Spring of 1955, Schnell ordered Huth seals for his meat emulsifier and used them in his emulsifiers before September of 1955. He found, before July, 1955, that if he covered the exhaust with his hand, he could obtain a hydraulic column which, however, overloaded the motor but greatly increased output. Since German requirements did not call for larger output and the Huth seals were not satisfactory for general use, Schnell put the matter aside until he obtained rubber Goetz seals (DX–9) commencing in January, 1956. At that time he also received a request for larger motors from Griffith's representative, Mr. Young.

Schnell 1485–88, 1490, 1646–49, 1666–70; DX–271A, pages 14, 30, 31, 36–38; DX–271B, pages 136, 145; DX–271F, pages 500, 501; PX–125 and –125A; PX–126 and –126A; PX–127 and –127A; Furthmuller 1705–07.

38. Mr. Carroll L. Griffith, president of the plaintiff, Griffith Laboratories, first learned of the Schnell emulsifier in January of 1956 from a Griffith salesman, Mr. Young, who was in Germany.

Griffith 524, 525.

39. Griffith first ordered a Schnell emulsifier in January of 1956 and it (PX–81) arrived in this country at the end of April of 1956. It was powered with an electric motor that was rated at 25 horsepower on 60 cycle current and turned at 3600 r. p. m. The drive shaft for the knife was not sealed to prevent ingress of air into the machine during operation.

Turner 120–22, 146; Griffith 524, 525; R. 674.

40. The first Schnell machine (PX–81) that was received by Griffith was sent to Coronet Packing Company (hereafter referred to as "Coronet") in Chicago for the purpose of testing and demonstrating the machine. This particular machine will hereafter be referred to as the "Coronet machine."

Turner 154; Griffith 525, 526; R. 674.

41. The Coronet machine (PX–81) was demonstrated by Griffith at Coronet during the National Independent Meat Packer's Association convention in Chicago during May of 1956.

Turner 154, 155; Griffith 525, 526; Swanson 90, 91; R. 674.

42. The Coronet machine (PX–81) did not produce a hydraulic column; however, it did produce an outstanding emulsion compared to anything then available, particularly with respect to materials such as pig skins and offal meat material.

Turner 146; Swanson 90; R. 674.

43. A slushy mix of skins and ice was fed into the machine (PX–81) at Coronet during May of 1956. An emulsion was produced that had a consistency resembling ordinary cold cream. Mr. Swanson, then with the John Morrell Company, described the skins as having been made " * * * into smooth, creamy emulsion that heretofore hadn't been possible to do."

Turner 148–50; Swanson 91.

44. When a bologna or frankfurter mix was fed into this Schnell machine (PX–81), the material had to be pushed down through the hopper to the knife

and there was a considerable temperature rise, although the emulsion had a very fine texture.

### Turner 151, 152.

45. While this Schnell machine (PX–81) was at Coronet, it was discovered by Griffith that the motor was overloaded.

### Turner 155.

46. During May of 1956, Griffith requested from Schnell an emulsifier having greater horsepower. Schnell confirmed this order the same month. Long before this time, Schnell had used a seal about the drive shaft of his high speed meat emulsifiers.

### Turner 155–156; Schnell 1484; Bihler 1461, 1469, 1470, 1546; Furthmuller 1722; PX–144 and –144A.

47. In September of 1956 Griffith received from Schnell a "Mince Master" machine with a more powerful motor and a seal. It was sent by Griffith to Saratoga Meat Products Company (hereafter referred to as "Saratoga") in Chicago for test and demonstration purposes. Ammeter readings showed that the machine was operating at between 75–80 horsepower, although it was previously thought by Griffith that a 35 horsepower motor would be adequate.

### Turner 154, 156–160; Griffith 529; R. 674.

48. During the American Meat Institute convention that was held in Chicago in September of 1956, Griffith displayed the "Mince Master" emulsifier and demonstrated this sealed machine at Saratoga.

### Turner 157; R. 674.

49. A "Cutfix" meat emulsifier of Robert Friess K. G. (hereafter referred to as "Friess"), of Germany, was shown for the first time in this country at that convention. It was a copy of a Schnell emulsifier.

### Griffith 526, 527; DX–271F, page 432; PX–65; PX–67; PX–80.

50. Allbright-Nell, a manufacturer of equipment used by the meat industry, saw the "Mince Master" emulsifier during the American Meat Institute convention in the Fall of 1956.

### R. 570.

51. About September, 1956, Mr. Carroll L. Griffith, president of Griffith, received a telephone call from Mr. Norman Allbright, president of Allbright-Nell. Mr. Allbright asked if it were possible for Allbright-Nell to enter into an arrangement whereby Schnell's "Mince Master" machine might be built in the Allbright-Nell plant. Mr. Griffith explained that this was not possible because Griffith Laboratories was Schnell's U. S. agent and that Schnell had manufacturing facilities in Germany and wanted to build the emulsifiers there.

### Griffith 529, 530; R. 565.

52. Allbright-Nell sought and obtained from Friess a "Cutfix" meat comminuting emulsifier in January of 1957. This machine was a copy of a Schnell emulsifier.

### DX–271F, page 432; R. 190, 566, 674, 675; PX–65; PX–67; PX–78; PX–80; Photograph A of PX–17.

53. In January of 1957, Allbright-Nell started to duplicate the "Cutfix" machine. Allbright-Nell made castings from it and built an Americanized version (PX–68, Photograph B of PX–17) from these castings.

### R. 190, 191, 567, 573, 591, 675; PX–65; PX–67; PX–68; Photograph B of PX–17.

54. In describing this copying, Mr. Ralph W. Illsley, chief engineer for Allbright-Nell, testified on page 19 of his deposition:

"A. * * * We found that the German fabrication was a problem for the maintenance people and we elected to construct a machine on American standards with American bolts and nuts and screws and things of that kind which a mechanic would replace in the field. The Germans came in with all metric system parts

which were absolutely not interchangeable.

"Q. You say, 'We decided this.' Was that decision one that you made or did somebody else participate in it?

"A. It was our management group.

"Q. Who was the management group at that time?

"A. Mr. Allbright, Mr. Norman Allbright, Mr. John Allbright.

"Q. And yourself?

"A. Yes."

R. 591, 592.

55. On page 20 of his deposition, Mr. Illsley added:

"Q. Now after this decision to rebuild on American standards was made, did you rebuild?

"A. Yes. We took the German machine, part for part, and made new parts similar, but to American standards, and installed them. We also found the German motors to be troublesome and we installed new American Motors."

R. 592, 593.

56. Mr. Carroll L. Griffith warned Mr. Norman Allbright that Griffith Laboratories and Schnell expected to be granted patents in the U. S. and that Schnell was defending his European patents and would likewise defend his U. S. patents. This was confirmed by Mr. Griffith's letter of March 22, 1957.

Griffith 532, 533; PX–40.

57. Representatives of Friess told Allbright-Nell in February of 1957 that Friess wanted Allbright-Nell to be the U. S. "Cutfix" representative. In May of 1957, Mr. Allbright told Friess that in the light of Schnell's patent position, Allbright-Nell would not enter into an agreement with Friess, but said nothing about Allbright-Nell's copying of the "Cutfix" machine.

R. 565, 675.

58. During May of 1957, Eckrich, a sausage manufacturer, and Allbright-Nell orally agreed to cooperate in constructing and testing an emulsifier for meat.

R. 676.

59. On June 13, 1957, an Americanized "Cutfix" machine having a larger hopper and larger American motor was sent by Allbright-Nell to Eckrich. This machine was a copy of a Schnell emulsifier.

R. 191, 676; PX–68; Photograph B of PX–17.

60. Mr. Nicholas H. Nusbaum of Eckrich said that after seeing the "Mince Master" machine at Saratoga, he liked it and thought that the Americanized version was "almost identical" to the "Mince Master" machine, however, "built to American standards." This view was shared by others at Eckrich and is readily evident upon comparison of the machines.

R. 613; PX–41; PX–73; PX–103.

61. During the Fall of 1957 and thereafter, defendants agreed and conspired together:

(a) To modify further the Americanized "Cutfix" machine (PX–68, Photograph B of PX–17) and have the modified machine operate like the "Mince Master" emulsifier that was displayed by Griffith during the American Meat Institute convention in September of 1956;

(b) To procure from Griffith a "Mince Master" emulsifier made by Schnell and sold in the U. S. by Griffith;

(c) To carry out tests with a "Mince Master" emulsifier at Eckrich;

(d) To use the "Mince Master" emulsifier and spare parts for testing and providing a standard for copying purposes and for comparing and finalizing their copies; and,

(e) To market an emulsifier resembling the "Mince Master" emulsifier for the general public, regardless of any

U. S. patents issued to Schnell or owned by plaintiffs, or either of them.

(a) R. 613, 614, 622, 624, 628–34, 636–41, 649, 650; PX–43; PX–44; PX–48; PX–52A; PX–52B; PX–53; PX–92A and C–R; PX–94A–H; PX–99; PX–100; PX–101; PX–104; PX–105; PX–107; PX–108; PX–109; PX–110; PX–112; PX–113; PX–117.

(b) R. 631, 632, 637, 639; PX–97; PX–98; PX–102; PX–103; PX–104; PX–107; PX–111.

(c) R. 615, 631, 641, 642; Sondej 3291, 3320; Schmidt 3528–29; PX–103.

(d) R. 641–43, 645–50; Sondej 3287–89, 3291, 3320; Schmidt 3514–15, 3528–29; PX–49; PX–50; PX–51A; PX–51B; PX–53; PX–92A and C–R; PX–94A–H; PX–115; PX–116.

(e) R. 616, 637, 645, 659–62; PX–41; PX–45; PX–47; PX–115.

62. During this period, Allbright-Nell was given free access to emulsifiers and parts being built or tested at or by Eckrich. Plaintiffs had no such free access.

Sondej 3247, 3287–3291; Schmidt 3511, 3512; R. 616–617; DX–174; DX–175; DX–181A.

63. The oral agreement of May, 1957 between Allbright-Nell and Eckrich was in effect until March 10, 1959, at which time Eckrich and Allbright-Nell entered into a written agreement. The written agreement confirmed previous oral agreements for cooperation in the construction and testing of emulsifiers. Allbright-Nell also agreed to defend Eckrich against patent infringement suits by plaintiffs, or either of them.

R. 662–665, 676, 677; PX–54.

64. On September 21, 1957, during the American Meat Institute convention at the Palmer House Hotel in Chicago, Mr. Norman Allbright and Mr. Ralph W. Illsley of Allbright-Nell and Mr. Chester W. Schmidt and Mr. Henry Eckrich of Eckrich, met at the Palmer House and, at that time, planned to place an Ameri-canized "Cutfix" machine on its side or in a horizontal position.

R. 676, 677.

65. Eckrich ordered from Griffith a sealed "Mince Master" machine during the Summer of 1957 and received one on November 15, 1957. It was demonstrated at Eckrich during December of 1957. It revolutionized Eckrich's processing procedure. It enabled Eckrich to produce more and better meat emulsions than it ever obtained before. This "Mince Master" machine has been used extensively by Eckrich to emulsify for sale many hundreds of thousands of pounds of meat material, and was used by Eckrich as a standard for Allbright-Nell's and/or Eckrich's copies of the "Mince Master" machine.

R. 621, 622, 631, 632, 637, 639; Schmidt 3523–3529; Sondej 3287–3291; PX–10; PX–92A and C–R; PX–94A–H; PX–97; PX–98; PX–102; PX–103; PX–104; PX–107.

66. Eckrich made a horizontal emulsifier for making sausage during October-November of 1957 and it was tested by Eckrich during December of 1957.

R. 676, 677; Sondej 3278.

67. Eckrich received a second sealed "Mince Master" emulsifier from Griffith in April of 1958. This machine was designated by Eckrich as a stand-by machine for the first "Mince Master" machine to assure Eckrich that it would always have a "Mince Master" machine available for commercial production.

R. 677; Schmidt 3528.

68. Defendants attempted to use a 90° elbow or neck (PX–66, PX–160) between the hopper and knife of their horizontal machine. Since this neck lacked the sloping wall of Schnell Patent 2,840,318, it did not feed material to the knife properly, and defendants were forced to adopt a neck that necessarily included the frusto-conical shape substantially as shown in that patent. The reservoir was connected to the comminuting chamber at the frusto-conical neck portion of the comminuting chamber.

R. 192, 598, 599; Turner 258, 310, 311; Sondej 3303–3310, 3311–3317; PX–50, pages 2 and 3; PX–66; PX–83; PX–92A and C–R; PX–94A–H.

Description of the "Mince Master" Machines.

69. The "Mince Master" emulsifying machines have a reservoir or supply chamber or portion, a comminuting portion or chamber, and an expeller or discharge chamber or portion with an outlet.

Turner 124–127, 131, 236, 257–262, 314–17; PX–1; PX–10; PX–11; PX–14; PX–79; PX–81.

70. The reservoir is connected to the comminuting chamber at the narrow neck portion of that chamber. The comminuting chamber contains a high speed propelling knife which rotates above and in contact with a flat, stationary, multi-perforated valve plate. The knife is powered by a very powerful motor. The plate has a large number of small openings therein and separates the comminuting chamber from the expeller or discharge chamber. A rotary expeller assists in moving comminuted meat material through the openings in the plate and out of the discharge chamber. The "Mince Master" machines are sealed to provide a substantially air-free hydraulic column.

Turner 126, 127, 131–133, 179, 259, 269–272, 275–278; PX–1; PX–11; PX–14; PX–79; PX–81.

71. The "Mince Master" perforate plates act as a valve in creating substantial back pressure in the comminuting portion.

Turner 441; Schoenherr 3810, 3811, 3818, 3882; Fishleigh 2804–2809.

72. The "Mince Master" machines have lugs which are positioned in obstructing and shearing relationship with the rotating knife. The lugs direct circulation of meat material toward the knife and perforate valve plate and relieve or counteract back pressure exerted by the plate. Recirculating surfaces also direct meat material toward the rotating knife and plate and counteract some of the back pressure exerted by the plate but to a lesser degree than the lugs.

Turner 177–179, 206–210, 236–239, 258–260, 314–317, 389–392; PX–1; PX–79; PX–81.

73. The knives used in the "Mince Master" machines are each balanced for rotation and have a hub portion with cutting arms extending outwardly thereof. The perforate valve plate has a large central opening in which the base of the circular hub of the knife rotates. Each of the arms of the knives has an upper or leading cutting edge and a lower or trailing cutting edge. These two cutting edges join each other at the outer extremities of the arms. Each knife arm also has a sloping propelling face extending from the leading edge toward the perforate valve plate. The face of each arm acts as a propeller to urge meat material toward the perforate valve plate. The trailing or lower cutting edges of the arms contact the plate and cut or shear meat thereat. The upper edges and the propelling face of the arms extend centrally of the periphery of the hub at the upper surfaces of the hub.

Turner 131–134, 136–144, 184, 273; PX–1; PX–12A; PX–13A; PX–16; PX–81A.

74. The "Mince Master" knives have arms that taper outwardly toward their tips and toward the perforate valve plate to provide hydrodynamic balance.

Turner 137, 274; PX–1; PX–12A; PX–13A; PX–16; PX–81A.

75. Each arm of the "Mince Master" knives has a "pressure pocket" as shown at 95 in Fig. 6 of Schnell's Patent 2,934,-120 (Fig. 6 is also shown in PX–27). The pocket is of value in taking care of gristle, small tendons and similar materials that are not readily cut and otherwise tend to accumulate as irregularly shaped particles about the size of "BB" shots. The pressure pocket is located at a proper distance above the lower cutting edge to force such tough materials into better cutting engagement with the low-

er cutting edge and the openings (74 in Fig. 6 of PX–27) of the perforate plate.

> Turner 137, 138, 143, 144; PX–1; PX–12A; PX–13A; PX–16; PX–81A.

76. The "Mince Master" machines have adjusting structure which enables the user to adjust the relationship of the knife to the perforate plate and the degree of friction between them.

> Turner 231–233, 262–263, 315–321; PX–1; PX–11; PX–79; PX–81H.

77. In the "Mince Master" machines, meat material is fed into the reservoir to the high speed rotary propelling knife. The material contacting the upper surface of the hub portion of the knife spreads outwardly. The upper cutting edges of the knife cut material in conjunction with lug structure positioned above the knife as well as about the path of rotation of the knife. The knife propels material centrifugally outwardly as well as toward the perforate valve plate, and material that advances to the lower cutting edges of the knife is cut in conjunction with and at the small holes in the perforate valve plate. Material which is brought to the plate but does not go through it is recirculated outwardly and inwardly in a retrograde manner to the restricted entrance of the comminuting portion and is again fed with the central column of new material to the knife and plate. Material is thus presented and represented to the knife and plate and there is repeated mixing of material. The expeller below the plate produces suction on the plate which helps pull material through it and, at the same time, propels material toward and through the discharge opening.

> Turner 131–134, 143–145, 263–278; Schoenherr 3791, 3798–3836; PX–1; PX–11; PX–12A; PX–13A; PX–79; PX–81.

78. The "Mince Master" machines provide during their operation an air-sealing head of material and a continuously advancing hydraulic column of material.

> Schoenherr 3848–3850; Turner 442.

Description of Anco "Emulsitator" Machines.

79. Allbright-Nell made, used or sold, and Eckrich and Allbright-Nell conspired to make, use or sell, and in certain instances Eckrich used, all in the United States, "Emulsitator" machines.

> See annotations for Finding 61; PX–37; PX–38; R. 348–355.

80. Defendants, or either of them, Americanized the "Cutfix" machine shown in PX–67 to produce the machine shown in PX–68 and used the same lug structure in the Ft. Worth "Emulsitator" machine shown in PX–18 and Photograph A of PX–28. The four spaced-apart lugs of the Ft. Worth machine are in shearing relationship to the knife. Photograph A of PX–28 is shown below.

> R. 191, 591–593, 613; PX-41; PX-73; PX-103.

81. The lugs of the Ft. Worth machine extend radially inwardly from the neck or throat portion of the comminuting chamber that is adjacent the reservoir and extend longitudinally toward the perforate valve plate.

Turner 323; PX–18.

82. The Ft. Worth machine with an "Emulsitator" high speed, tapered propelling knife (PX–21, Drawing A of PX–26, PX–25) and as shown, in part, in PX–18 and Photograph A of PX–28, was sent by defendants, or either of them, to Armour and Company at Ft. Worth, Texas, at least as early as February 7, 1959. The machine was operated commercially at Ft. Worth but was not purchased by Armour. This machine is shown on page 905, below.

Turner 194, 196; Cypser 55.

83. A later Anco "Emulsitator" emulsifier such as exemplified by PX–29 was constructed for use with a high speed, tapered propelling knife (PX–21, Drawing A of PX–26, PX–25) and included the first modification of the arrangement of the lugs. This machine is shown, in part, in Figs. 4, 7 and 8 of Drawing A–1 on page 906, below. This same machine was later used with a high speed, non-tapered propelling knife (PX–22, Drawing B of PX–26, PX–25) as shown, in part, in Figs. 4A, 7A and 8A of Drawing A–2 on page 907, below.

PX–19; PX–21; PX–22; PX–37; PX–63; R. 325.

84. The first modification of the lugs involved separating that portion of the ring of lugs that was positioned outside the path of rotation of the knife from that portion of the lugs that was positioned in the neck of the comminuting chamber and adjacent the reservoir, and changing the name of the neck lugs to "anti-swirl vanes." Each of the lugs is in shearing relationship to the tapered and non-tapered "Emulsitator" knives. These separated lugs are shown below in Photographs B1 and B2 of PX–28.

Turner 328, 332; Sondej 3283-85.

85. An Anco "Emulsitator" emulsifier such as shown in PX–31 followed that of PX–29. This machine has tapered and non-tapered "Emulsitator" knives and includes a second modification of the lug structure. The machine is shown, in part, with a high speed, tapered propelling knife (PX–21, Drawing A of PX–26, PX–25) and high speed, non-tapered propelling knife (PX–22, Drawing B of PX–26, PX–25) in Drawings B–1 and B–2, respectively, on pages 908 and 909, below.

PX–20; PX–21; PX–22; PX–31; PX–37; PX–64; R. 324.

86. The second modification of the lugs involved the use of an additional number of lugs around the path of rotation of the knife and the choking-down of the neck leading to the knife so that the entire area between the four spaced-

apart neck lugs was filled or replaced with wall structure that provides a continuous annular lug adjacent the reservoir. The lugs around the path of rotation of the knife consist of a continuous lug ring. The continuous lug of the neck and lug ring are in shearing relationship with the tapered and non-tapered knives. This modification is shown below in Photographs C1 and C2 of PX–28.

Turner 336–337.

87. If a circle were drawn connecting the free ends of the lugs shown in Photograph B1 of PX–28, the neck becomes choked-down to the circle (i. e., to the size of the opening shown in Photograph C1). This is shown below wherein the white circle shows the inward extension of the wall that distinguishes the neck of Photograph B1 from that of C1.

88. The lug structure around and above the tapered and non-tapered knives in the "Emulsitator" machines provides some recirculation in the comminuting chamber.

Turner 308; Fishleigh 2812–2813; Schoenherr 3791, 3797–3836.

89. The lugs of the Ft. Worth machine shown in Photograph A of PX–28 and the "Emulsitator" machines shown in Photographs B1 and B2 of PX–28, and the lugs (continuous lug of the choked-down neck and lug ring encircling the path of rotation of the knife) of the "Emulsitator" machines shown in Photographs C1 and C2 of PX–28, each work in substantially the same way and accomplish substantially the same result, although they differ in form and shape and may differ in name.

Turner 194–202, 292–313, 325–332, 334–337, 340–343; PX–18; PX–19; PX–20; PX–28; PX–83.

90. Each of the "Emulsitator" machines (Ft. Worth machine and Drawings A–1, A–2, B–1 and B–2 shown on pages 905 to 909) has a reservoir or supply chamber or portion, a comminuting

"EMULSITATOR" MACHINE

## DRAWING A-1.

Fig. 7

Fig. 8

Fig. 4

WITH TAPERED KNIVES

DRAWING A-2.

FIG. 7A

FIG. 8A

FIG. 4A

WITH NON-TAPERED KNIVES

DRAWING B-1.

FIG. 2

FIG. 3

WITH TAPERED KNIVES

FIG. 1

DRAWING B-2.

FIG. 2A

FIG. 3A

FIG. IA

WITH NON-TAPERED KNIVES

chamber or portion, and a discharge chamber or portion with an outlet. The reservoir is connected to the comminuting chamber by a narrow neck portion of that chamber. The comminuting chamber contains a propelling knife which rotates at high speeds above and in contact with a flat, stationary, multi-perforated valve plate that separates the comminuting chamber from the discharge chamber. The knife is powered by a very powerful motor. A rotary expeller is positioned in the discharge chamber and assists in moving comminuted meat material through the small openings in the plate and out of the discharge chamber. These machines are sealed during operation to provide a substantially air-free hydraulic column.

Turner 130, 194–202, 206–211, 292–304, 307–313, 325–332, 334–337; Schoenherr 3791, 3797–3836; PX–18; PX–19; PX–20; PX–83; PX–170; PX–171.

91. Each of the "Emulsitator" machines (Ft. Worth machine of PX–18 and Drawings A–1, A–2, B–1 and B–2) has lugs which are positioned in obstructing and shearing relationship with the rotating knife. In addition, lugs direct circulation of meat material toward the knife and plate and relieve or counteract back pressure exerted by the perforate valve plate. Recirculating surfaces also direct meat material toward the rotating knife and plate and counteract some of the back pressure exerted by the perforate valve plate but to a lesser degree than the lugs.

Turner 200, 205, 206, 310, 323, 328, 336, 477–79; Schoenherr 3791, 3797–3836; Fishleigh 3092, 3093; PX–18; PX–19; PX–20; PX–83; PX–170; PX–171.

92. The tapered and non-tapered high speed "Emulsitator" knives used in these machines are each balanced for rotation and have a hub portion with cutting arms extending outwardly thereof. The perforate valve plates have a large central opening in which the base of the circular hub of the knives rotates. Each of the arms of the knives has an upper or leading cutting edge, and a lower or trailing cutting edge. These two cutting edges join each other at the outer extremity of each of the arms. The arms of the knives also have a sloping propelling face extending from the leading edge toward the perforate valve plate. The face of each arm acts as a propeller to urge meat material toward the perforate valve plate. The trailing or lower cutting edges of the arms of each knife bear on the plate and cut or shear meat thereat. The upper edge and the propelling face of the arms of each knife extend centrally of the periphery of the hub at the upper surface of the hub.

Turner 196–199, 202–206, 308, 309, 329, 330, 344–346; R. 602–605; PX–18; PX–21; PX–22; PX–25.

93. The "Emulsitator" high speed knife (PX–20, Drawing A of PX–26, PX–25, PX–27), used in the Ft. Worth machine of PX–18 on page 905, above, and "Emulsitator" machines shown in Drawings A–1 and B–1 on pages 906 and 908, above, have cutting arms that taper outwardly toward their tips and toward the perforate valve plate.

Turner 196, 197, 344; PX–21; PX–25.

94. The speed of rotation of the arms of the tapered and non-tapered knives increases toward their tips and the force exerted by the arms on meat material also increases with the increase in speed.

R. 605.

95. The taper of the tapered "Emulsitator" knife equalizes the work done along the length of the arms so that the outer ends of the arms of the knife do not tend to lift from the perforate plate. The taper thus provides hydrodynamic balance.

R. 602–605.

96. The arms of the tapered "Emulsitator" knife each have a forward propelling face that is inclined downwardly and rearwardly from the upper cutting edge. The face of each such arm has a changing and increasing degree of inclination relative to the axis of rotation as the face approaches the path of rotation of the lower cutting edge. This changing and increasing degree of inclination provides a pressure pocket that extends forwardly in rotation of the lower edge and extends along the length of the lower edge. This pressure pocket urges material that is difficult to cut into better cutting engagement with the lower cutting edge and the small holes in the perforate plate. The pressure pocket of the tapered knives of Griffith and defendants is shown in PX–27.

Turner 196–199, 308, 309, 329, 330, 340–341, 344–346; R. 603; PX–18; PX–19; PX–20; PX–21; PX–25; Drawing A of PX–26; PX–27.

97. The non-tapered "Emulsitator" knife (PX–20, PX–22, Drawing B of PX–26, PX–25) also has a propelling face. Further, it has a pressure pocket that is narrower in the direction of rotation than that of the tapered "Emulsitator" knife.

Turner 340–341, 344–346; PX–20; PX–22; PX–25.

98. The following photograph is a copy of PX–25 which compares the tapered and non-tapered knives used in the "Emulsitator" machines. Photograph C shows the pressure pockets of both knives.

Turner 344–346.

99. Each of the "Emulsitator" machines (Ft. Worth machine and Drawings A-1, A-2, B-1 and B-2) has adjusting structure which enables the user to adjust and fix the relationship of the knife (i. e., tapered and non-tapered knives) to the perforate plate and the degree of friction between them.

Turner 298–304, 321, 322, 329, 339–343; PX–18; PX–19; PX–20; PX–63; PX–64; Highley 3621.

100. The perforate valve plate of the "Emulsitator" machines has an outer diameter of 248 mm. and a large central opening with a diameter of 120 mm. The knives used in "Emulsitator" machines rotate at about 2,000–2,400 r. p. m. and are driven by 60–100 horsepower motors. Griffith's "Mince Master" machines that have a perforate valve plate having the same outer and inner diameters are powered by an 85 horsepower motor and have a knife that is rotated at about 2,800–3,600 r. p. m.

Turner 179, 180, 210, 237; R. 689, 690; PX–13B; PX–24; PX–55; PX–59; PX–81; PX–83.

101. The defendants operate or sell commercially "Emulsitator" machines with an expeller. They presented no evidence of commercial use or sale of "Emulsitator" machines without the expeller. Ex parte tests were conducted by them for the trial with the less effective and smaller expeller such as shown in DX–154, wherein the expeller is formed by the splines on the shaft after the expeller, which is normally mounted thereon, is removed.

Schoenherr 3851–3853; PX–18; PX–19; PX–20; PX–55; PX–56; PX–59; PX–63; PX–83.

102. Meat material emulsified in the "Emulsitator" machines (Ft. Worth machine and Drawings A-1, A-2, B-1 and B-2) is fed into a reservoir and from there through the neck portion of a comminuting chamber to the high speed rotary propelling knife. The incoming material strikes the upper surface of the hub portion of the knife and spreads outwardly. The upper cutting edges of the knife coact in cutting material with obstructing means positioned in and associated with the comminuting chamber. The obstructing means include the lugs (spaced-apart lugs in the neck portion of the comminuting chamber and around the path of rotation of the knife of (a) the Ft. Worth machine on page 905, above, and Photograph A of PX–28, (b) Drawings A-1 and A-2 on pages 906 and 907, above, and Photographs B1 and B2 of PX–28, and (c) the continuous annular lug of the choked-down neck and lug ring shown in Drawings B-1 and B-2 on pages 908 and 909, above, and Photographs C1 and C2 of PX–28).

Turner 209–210, 308–311, 329–332; PX–18; PX–19; PX–20; PX–83.

103. Each of the "Emulsitator" knives (tapered and non-tapered) propel material centrifugally outwardly of its axis of rotation as well as toward the perforate valve plate, and material that advances to the lower cutting edge of the knive arms is cut in conjunction with and at the multitude of small openings in the perforate valve plate.

Turner 196–199, 308, 309, 329, 330; PX–18; PX–19; PX–20; PX–21; PX–22; PX–83.

104. The "Emulsitator" perforate valve plate exerts a back pressure because it cannot pass material as fast as it is fed to it. This back pressure subjects material to retrograde and axially spiral movement away from the plate while, at the same time, the centrifugal action of the knife causes material to be moved outwardly. The material then moves back and inwardly toward the axis of rotation to the neck portion of the comminuting chamber and mixes with the incoming material. Meat material is thus presented and re-presented to the high speed propelling knife and perforate valve plate and there is repeated mixing of material in the comminuting chamber.

Turner 209–210, 310, 311, 329–332, 441, 442, 477–479; Schoenherr 3848–3850.

105. The lugs and the substantially frusto-conical inwardly and upwardly sloping wall of the neck of the comminuting chamber of each of the "Emulsitator" machines (Ft. Worth machine and Drawings A–1, A–2, B–1 and B–2) provide recirculation toward the knife and plate.

Turner 308–311, 329–332, 388–389; Fishleigh 2744–2747; Schoenherr 3791, 3798–3836; PX–18; PX–19; PX–20; PX–83.

106. The expeller below the "Emulsitator" perforate valve plate produces suction on the perforate plate which helps pull material through the plate and propels a uniformly distributed meat emulsion from the plate to and through the discharge opening.

Turner 210, 308, 309, 329–331, 442; Fishleigh 2855, 2856, 3077; Schmidt 3433, 3568–3569; Schoenherr 3848–3850; PX–18; PX–19; PX–20; PX–55; PX–56; PX–59; PX–63.

107. An air-sealing head of meat is positioned above or in advance of the knife in the "Emulsitator" machines and a continuously advancing hydraulic column of meat material extends from at least the entrance of the comminuting chamber to the discharge opening.

Schoenherr 3848–3850, 3904; R. 596–597.

108. It makes no functional difference in the operation of the "Emulsitator" machines whether the knife rotates horizontally about its vertical axis as it does in Griffith's "Mince Master" machines, or rotates vertically about a horizontal axis as is the case with the Anco "Emulsitator" machines. Although the horizontal "Emulsitator" machines provide a lower hopper than the Americanized "Cutfix" machine from which it was copied, this in itself is a mere mechanical expedient and may also be obtained by moving the motor of the Americanized "Cutfix" machine to the side of the machine.

Turner 204, 209, 210; Schoenherr 3791, 3797–3836; PX–170; PX–171.

109. The "Emulsitator" machines (Ft. Worth machine and Drawings A–1, A–2, B–1 and B–2) do the same work in substantially the same way as Griffith's "Mince Master" machines and accomplish substantially the same results, even though they differ in name, form and shape.

Cypser 56, 57, 66, 70; Turner 209, 210; Schoenherr 3791, 3797–3836; PX–170; PX–171.

Hydraulic Column in "Emulsitator" Machines.

110. The meat material that is emulsified in the "Emulsitator" machines (Ft. Worth machine and Drawings A–1, A–2, B–1 and B–2) is in the form of a continuous hydraulic column that has so little air present that the plastic meat material acts according to the law of hydraulics from the entrance of the comminuting chamber to the point of discharge. To propel this hydraulic column through these machines, a large motor is required and used.

Schoenherr 3848–3850, 3904; Schnell 1666–1670; Turner 210, 308, 309, 329–331, 442; R. 690; PX–18; PX–19; PX–20; PX–83.

111. The unexpected importance of having this hydraulic column was admitted by the defendants.

R. 596–597; PX–46; PX–53; PX–55; PX–56; PX–58; PX–59; PX–61; PX–62.

112. Mr. Illsley, chief engineer for Allbright-Nell, conceded during his deposition that the hopper of the emulsifier had to be sealed because if any substantial amount of air came in with the meat, the meat would not be cut. He said:

"If you get sufficient air in the cutting chamber, the meat does not flow to the knives and therefore it cannot be cut."

R. 596–597.

113. Del Proctor, plant engineer for Eckrich, wrote a letter (PX–46) to Mr. Crawford, vice-president and sales manager of Allbright-Nell, in September of 1957, wherein he acknowledged that Eckrich was unexpectedly surprised to find that by sealing the knife shaft to prevent the ingress of air, there resulted an increase in the rate of emulsified product as well as the load on the motor. On page 2 of this letter, Proctor stated:

"On Tuesday, Sept. 24th, Mr. Schmidt, Mr. Nusbaum and myself had a discussion regarding the operation of the emulsifier and tried to establish some reason for the increase in ampere loads at the motor. It was my conviction that the mechanical seal for some unknown reason was causing the increase in amperage to the motor. None of us could justifiably believe that the seal unit itself was causing this increased amperage, however, I submitted the suggestion that, possibly, with the seal unit we were not drawing air up from around the motor shaft and, possibly, creating a vacuum which helped to pull the meat through the super-fine plate.

"As a result of this discussion, we decided to take an ohm reading of the motor windings and we discovered that as of this date there has been no breakdown of the insulation to the motor winding and it was further agreed that we would make some test runs with the emulsifier and leave the mechanical seal unit out of the machine to check for the ampere reading. This test was conducted and the machine was run without the seal unit and our ampere readings dropped back to the original 55 to 60 amps., however, it was necessary to more or less hand-feed the emulsifier in that the operator was compelled to constantly push the meat down into the hopper so as to keep meat feeding into the knife and plate section of the machine as you witnessed here at our plant."

114. Mr. Everett Highley, of the Research and Development Department of Eckrich, wrote a memorandum (PX–53), dated September 5, 1958, to Mr. Schmidt, his supervisor at Eckrich, wherein he stated:

"* * * Mr. Griffith admitted that the seal is one of the secrets of the machine, meaning for the proper operation of it. I definitely agree. In fact, it can't be stressed too much. If the seal is not working properly, you have short knife life and short plate life which means short machine life. Of course, it doesn't stop there. A bad seal gives high temperature rise which in turn gives poor color and an excessive amount of air pockets in product."

115. The "Anco Emulsitator Operating Instructions," as well as revisions and supplements thereto, emphasize the importance of having defendants' seal operating to prevent ingress of air during operation.

PX–55; PX–56; PX–58; PX–59; PX–61; PX–62.

116. A small amount of air introduced into the "Emulsitator" machines through a one-quarter inch (outer diameter) copper tube stops their operation.

Turner 3742–43; Cypser 71.

Recirculation in "Emulsitator" Machines.

117. A meat emulsion includes water and oil or grease. It can only be formed with high speed whipping or mixing. This vigorous mixing action occurs in the Griffith "Mince Master" machines and Anco "Emulsitator" machines (Ft. Worth machine and Drawings A–1, A–2, B–1 and B–2) and results from the presentation and re-presentation of meat material to the high speed propelling knife and perforate valve plate (i. e., recirculation).

Turner 310, 367–368, 388–392, 408–409, 477–479; Schoenherr 3791, 3797–3836; Miner 3857, 3862–3863; PX–4.

118. Prior to trial, defendants admitted that such recirculation occurs in their "Emulsitator" machines. In their pre-trial brief, for example, defendants stated at page 30:

" * * * The Hilliker machine, *like Defendants'*, employs a plurality of spaced tines or lugs 43 disposed slightly beyond and in shearing relationship with the distal ends of the knife arms. Large particles of material which might clog the perforations in the plate 39 are spun outwardly by the knife through the spaces 42 between the lugs *for recirculation* into the column or mass of material being comminuted." (Emphasis added.)

At the trial, however, defendants argued that there is no recirculation in their "Emulsitator" machines when a non-tapered knife is used and only a negligible amount when a tapered knife is used. DX–112; DX–113; DX–115; DX–116.

119. Plaintiffs' expert, Dr. Schoenherr, amply demonstrated that there must be retrograde circulation and outward and inward movement of material in the "Emulsitator" machines. Dr. Schoenherr is not a professional witness, but an expert in hydraulic design with more than 40 years experience, much of it in charge of propeller design for the United States Navy. His straightforwardness was as impressive as his technical qualifications. Defendants did not even attempt to show how recirculation of material could be avoided. Even Mr. Fishleigh, defendants' patent expert, admitted this but tried to depreciate the amount of such circulation.

Schoenherr 3779–3782, 3791, 3797–3836; Fishleigh 2812, 2813; PX–170; PX–171.

120. The following facts are clearly established by the evidence:

(a) The meat above or back of the knife is still swirling when the Anco "Emulsitator" machine is stopped immediately after use. It could not be swirling at this point unless the force of the rotation of the knife had been transmitted backwardly by hydraulic means, as defined by plaintiffs and as admitted by defendants.

(b) Not only is there circulation above or in advance of the knife area in defendants' "Emulsitator" machines, but the uncontradicted testimony is that this circulation is so violent as to bend a quarter inch copper tube when placed at the exit end portion of the substantially frusto-conical part of the neck (point 1 on PX–31). On the other hand, the circulation at the opposite wall portion of the neck (point 2 on PX–31) does not have this degree of violence.

(c) Meat is delivered to the perforate valve plate at a speed of the order of 1000 inches per second and passes through at a rate of less than 10 inches per second. The rest of the material must be moved backward and mixed with inflowing material.

(d) Even defendants' crude and secret ex parte tests showed that the green dye which was injected twice per second into the comminuting chamber (during which the meat had moved forward some 5 inches) was evenly distributed throughout the discharged meat. This would not have occurred unless there was retrograde recirculation of meat in the comminuting portion.

(e) Plaintiffs' tests, made under operating conditions in a plant not under their control and in the presence of a Federal Inspector, showed that even with about a teaspoon of carbon black introduced at 6-inch intervals in the hopper, the colored areas of the discharged materials were uni-

form not only at the points where the carbon black was introduced, but at all points in between so that an extended rope of discharged product had uniform distribution of the carbon black throughout its length.

(f) Mr. Turner of Griffith pointed out that pieces of tough meat material that did not pass through the holes in the Anco "Emulsitator" valve plate were found accumulated *above or in advance of* the knife after the machine was stopped. These pieces moved rearwardly after reaching the plate, which could only occur as a result of retrograde recirculation.

    (a) Fishleigh 2792, 2793; Schmidt 3560, 3561.

    (b) Turner 3739–3742.

    (c) Schoenherr 3810, 3811, 3818, 3882; Fishleigh 2804, 2808, 2809.

    (d) Schmidt 3433, 3568–3569; Fishleigh 2855, 2856, 3077.

    (e) Turner 3743, 3745; Schoenherr 3785, 3787.

    (f) Turner 486–492, 518, 523.

Long-Felt Want and Commercial Success.

121. The Schnell emulsifier satisfied a long-felt want and met with prompt commercial success. From 1956 to March 1, 1963, Griffith sold in the U. S. about 790 to 795 "Mince Master" emulsifiers, which sales totaled about $3,183,564. During the period of from 1959 to February 28, 1963, Allbright-Nell sold in the U. S. about 166 "Emulsitator" emulsifiers.

Turner 357–359; R. 690; PX–37; PX–84.

Infringement of Patent 2,906,310.

122. U. S. Patent 2,906,310 to Schnell concerns emulsifiers that are sealed during operation to prevent the ingress of air and provide a hydraulic column.

123. Plaintiffs allege infringement of claims 1 to 8, inclusive. Claims 2 to 6 are dependent upon Claim 1.

124. With respect to claims 1 to 3 and 6, defendants assert that at least some of their machines do not include "obstructing means" associated with the comminuting portion and which coact with the knife. Defendants' machines include such structure (DX–86).

See annotations for Findings 91, 119 and 120; Turner 292–313, 325–332, 334–337, 340–343; PX–19; PX–20; PX–28; PX–83.

125. The comminuting portion of claim 1 includes the area where recirculation occurs. Schnell explained very clearly to the Patent Office that the comminuting portion includes the area where recirculation occurs and on page 122 of DX–11 he stated:

" * * * 'comminuting portion' obviously * * * includes the lug area defined in claim 44 [patent claim 5] and the 'restriction' (i. e., pinched neck) of claim 43 [patent claim 4]. In other words, the cutting as well as the recirculation area may be considered as within the comminuting portion."

126. The obstructing means in claims 1 to 3 and 6 include the restricted neck of the comminuting portion and/or lugs and/or recirculating surface. Claims 4 and 5 are dependent upon claim 1 and specifically state that the obstructing means includes "a restriction" and "lugs," respectively, adjacent the reservoir portion. The "obstructing means" of claim 1, therefore, should be construed broadly to cover such structures.

127. The knife is in coacting relationship with the lugs in defendants' machines, including the continuous annular lug of the choked-down neck shown in Drawings B–1 and B–2 and Photographs C1 and C2 of PX–28 and/or the inwardly sloping wall of the "Emulsitator" machines of each of Drawings A–1, A–2, B–1 and B–2 shown on pages 906 to 909:

Turner 310, 323, 326–333, 336–337, 340–342, 477–479; PX–19; PX–20; PX–83.

128. With respect to claim 4, the "restriction" of the "Emulsitator" machines of each of Drawings A–1, A–2, B–1 and B–2 are adjacent the reservoir portion.

129. With respect to claim 5, the (a) "anti-swirl" lugs in the neck of the comminuting portion of the "Emulsitator" machines shown in Drawings A–1 and A–2 and Photographs B1 and B2 of PX–28 and (b) continuous annular lug of the choked-down neck of the "Emulsitator" machines shown in Drawings B–1 and B–2 and Photographs C1 and C2 of PX–28, are each adjacent the reservoir portion.

Turner 326–333, 336–337; Sondej 3283; PX–19; PX–20; PX–28; PX–83.

130. The controversy with respect to claim 7 concerns whether defendants' machines have means to move axially and to fix the axial position of the knife, whereby the knife may be positioned for rotation in contact with the plate and may be moved away from the plate (DX–111). Defendants' machines include such structure, although they deny this (DX–111).

Turner 292–304, 329; Highley 3621; Fishleigh 2537–2542; PX–19; PX–20; PX–63; PX–64; PX–83.

131. Claim 8 is dependent upon claim 7 but adds that shaft means moves for adjustment of the knife with respect to the perforate plate. Defendants deny that their machines include such structure (DX–111). Their machines, however, do have such structure.

See annotations for Finding 130.

132. The "Emulsitator" machines have a spring which yieldingly urges shaft structure and the knife toward the perforate valve plate. By adjusting the tension of the spring or using a different spring having a different spring rate or strength, the force urging the knife and shaft structure toward or away from the plate is adjusted.

See annotations for Finding 130.

133. The strength of the spring used in the "Emulsitator" machines determines the spacial relationship of the knife to the perforate plate. During operation the knife rides on the plate but the degree of friction between the knife and the plate is determined by the spring adjustment.

See annotations for Finding 130.

134. The adjusting means of (a) the "Emulsitator" machines of each of Drawings A–1, A–2, B–1 and B–2, and of (b) Patent 2,906,310 do the same work in substantially the same way and accomplish substantially the same result, even though they differ in name, form or shape. Both adjusting means determine and fix the position of the knife with respect to the perforate plate. It is a mere matter of choice, design and expediency whether the knife moves with respect to shaft structure or shaft structure moves for adjustment of the knife.

See annotations for Finding 130.

135. The "Emulsitator" machines of (a) Drawings A–1 and A–2 and Photographs B1 and B2 of PX–28 and (b) Drawings B–1 and B–2 and Photographs C1 and C2 of PX–28, each include the structure of each of claims 1 to 8, inclusive, of Patent 2,906,310.

See annotations for Findings 124 and 130; PX–37; PX–38.

Infringement of Reissue Patent 24,683.

136. U. S. Reissue Patent 24,683 to Schnell covers methods of emulsifying meat materials for sausage products.

137. Plaintiffs allege infringement of claims 1 to 16, inclusive.

138. The controversy concerns whether defendants' methods include recirculation (a) in a retrograde direction and (b) outwardly from and inwardly toward the axis of rotation of the knife (DX–115). Both types of recirculatory movement occur in defendants' machines.

Turner 209–210, 308–310, 329–332, 388–392, 477–479, 509; Schoenherr 3791, 3797–3836; Fishleigh 2812–2813; PX–170; PX–171.

139. Claims 1, 2, 7, 8, 9 and 10 require that at least some meat within the comminuting chamber be moved in a retrograde direction, that is, that such meat be moved at some stage in its path backward toward the direction from which it originally came. Claims 3 to 6 and 11 to 16 do not require retrograde recirculation but merely that the recirculation of meat material within the comminuting chamber be outwardly and inwardly of the path of travel. The term "outwardly" is the direction away from the axis of rotation of the knife toward the periphery or tip of the knife. The term "inwardly" refers to the direction toward the axis of rotation. The descriptive portion of the patent clearly supports this construction of these terms.

140. The "Emulsitator" machines operate as stated in each of claims 1 to 16, inclusive, of Reissue Patent 24,683 and defendants, or either of them, so operated such machines.

See annotations for Finding 138.

Infringement of Patent 3,044,514.

141. U. S. Patent 3,044,514 to Schnell covers emulsifiers having structure that provides an air-sealing head or hydraulic column and, in addition, concerns the cooperative relationship of such structure with other structure.

142. Plaintiffs assert infringement of claims 1 to 15, inclusive, 17 and 18. The charge of infringement of claim 15 was withdrawn at the trial without prejudice to any other claim.

143. With respect to claims 1, 2, 17 and 18, the controversy concerns whether defendants' machines include "recirculating means" above or in advance of the knife for directing material from the plate to an air-sealing head or hydraulic column of material above or in advance of the knife (DX–116). Defendants' machines include such structure, although they deny this (DX–116).

See annotations for Findings 110, 117, 118, 119, 120; PX–19; PX–20; PX–83.

144. Claims 10 to 12 state that the knife must be tapered. Defendant's machines have such a knife.

See annotations for Finding 93.

145. Claims 3 to 14 refer to cap or hub structure of the knife upon which the incoming material spreads. Defendants deny that their machines have such spreading structure (DX–116). Their machines, however, do include such structure.

Turner 308–309, 329–332; PX–19; PX–20; PX–83.

146. Claims 6 to 8 state that the comminuting portion includes a "recirculating surface" and that this surface includes "means" that direct recirculating material inwardly to the hydraulic column. Claim 9 is dependent upon claim 6 but adds that the "recirculatory surface includes lugs." Claims 10, 13 and 14 state that the apparatus has "means" for directing material rearwardly and centrally into the advancing hydraulic column or toward the inlet and axis of rotation of the knife. Claims 3 to 5 state that the recirculating surface includes lugs and, in addition, state that the lugs are above or in advance of the knife, coact with the knife, and release or discharge some of the back pressure created by the perforate plate. Defendants' machines include the lug structure and/or recirculating means of claims 3 to 10, 13 and 14, although defendants deny this (DX–116).

Turner 308–311, 329–332, 388, 389; Schoenherr 3791, 3797–3836; Fishleigh 2744–2747, 2812, 2813; PX–19; PX–20; PX–28; PX–37; PX–38; PX–83; See annotations for Findings 91, 119 and 120.

147. The (a) lugs in the neck of the comminuting portion and the inwardly sloping wall of the "Emulsitator" machines shown in Drawings A–1 and A–2

and Photographs B1 and B2 of PX–28 and (b) the continuous annular lug and inwardly sloping wall of the choked-down neck of the "Emulsitator" machines shown in Drawings B–1 and B–2 and Photographs C1 and C2 of PX–28, each provide recirculation and relieve back pressure created by the perforate valve plate. The ring of lugs that encircles the path of rotation of the knife as shown in Drawings B–1 and B–2 and Photographs C1 and C2 of PX–28 also provides recirculation.

See annotations for Finding 146.

148. The tapered and non-tapered knives in the "Emulsitator" machines of (a) Drawings A–1 and B–1 and (b) Drawings A–2 and B–2, respectively, each have a cap or hub portion upon which incoming meat material spreads.

Turner 209–210, 308–311, 329–332; PX–21; PX–22.

149. With respect to claims 1 to 9, inclusive, 13, 14, 17 and 18 of Patent 3,044,514, the "Emulsitator" machines of (a) Drawings A–1 and A–2 and Photographs B1 and B2 of PX–28, and (b) Drawings B–1 and B–2 and Photographs C1 and C2 of PX–28, each include the structure of each of these claims.

See annotations for Findings 143, 144, 145, 146, 148; PX–37; PX–38.

150. The "Emulsitator" machines having a tapered knife such as shown in Drawings A–1 and B–1, each include the structure of each of claims 10 to 12, inclusive, of Patent 3,044,514.

See annotations for Finding 149.

Infringement of Patent 2,934,120.

151. U. S. Patent 2,934,120 to Schnell concerns certain details of a high speed tapered knife.

152. Plaintiffs allege infringement of claims 1 and 2.

153. Claim 1 is directed to a tapered knife that has an upper or leading cutting edge, a sloping propelling face portion extending within and beyond the periphery of the hub of the knife and a lower or trailing cutting edge extending outwardly beyond the hub.

154. Claim 2 is dependent upon claim 1 but adds that the arm of the knife has a back surface rearward of the face and leading edge that slopes downwardly and outwardly.

155. The following photographs taken from PX–25 show the tapered knife that has been constructed for use in the "Emulsitator" machines.

 

156. The tapered "Emulsitator" knife has been constructed for use and used in the "Emulsitator" machines and includes the structure of each of claims 1 and 2 of Patent 2,934,120.

Turner 344–347; PX–18; PX–19; PX–20; PX–25; PX–37; PX–38; PX–83.

Infringement of Patent 2,934,121.

157. U. S. Patent 2,934,121 to Schnell concerns certain specific details of a knife and the comminuting apparatus having such a knife.

158. Plaintiffs assert infringement of claims 1 to 24, inclusive.

159. Claims 1 to 9, 16 and 19 to 22, inclusive, relate to a rotary knife, whereas claims 10 to 15, inclusive, 17, 18, 23 and 24 concern comminuting apparatus having a particular knife.

160. The following chart outlines the structure of knife claims 1 to 9, inclusive,

16 and 19 to 22, inclusive. The symbol "X" indicates that the structure set forth in the headings of the chart below is present in the designated claims.

| Claim | Knife Is Tapered | Hydro-dynamically Balanced Knife | Knife Has Pressure Heel or Pocket | Knife Is Wider Than High | Knife Has Chisel Trailing Edge | Knife Has Rearward Slope From Leading Edge | Knife Is Shaped to Oppose Movement Outwardly | Knife Has Axially Gathering Surface |
|---|---|---|---|---|---|---|---|---|
| 1 | X | X | X | | | | | |
| 2 | X | X | X | | | X | | |
| 3 | X | X | X | | X | | | |
| 4 | X | X | X | | | | | |
| 5 | X | X | X | | | | | |
| 6 | X | X | X | | | | X | X |
| 7 | X | X | X | X | | X | | |
| 8 | | | X | X | | | X | X |
| 9 | | | X | X | | | | |
| 16 | X | X | X | | | | | |
| 19 | X | X | | | X | | | |
| 20 | X | X | | X | X | | | |
| 21 | X | X | X | | | | X | X |
| 22 | X | X | X | | X | | X | X |

161. Referring to the chart of the preceding Finding in added detail, claim 16 concerns a hydrodynamically balanced or tapered knife but no reference is made to a pressure pocket. Claims 1 to 7, inclusive, 21 and 22 concern a hydrodynamically balanced or tapered knife having a pressure pocket. Claims 3, 19, 20 and 22 also state that cutting arms of the knife each have a trailing edge that is in the form of a chisel. Claims 7 to 9, inclusive, 16 and 20 also state that the cutting arms of the knife are wider than they are high. Claims 2 and 7 also state that the arms of the knife each have an upper surface that slopes gradually rearwardly in rotation away from the leading edge toward the cutting path of the trailing edge.

162. Claims 6, 8, 21 and 22 further state that the face of the cutting arms of the knife is shaped to provide an inclined surface that propels or gathers meat material toward the perforate plate and has a pressure pocket that exerts a force that tends to oppose movement of meat material outwardly toward the tip of the knife arms in a region near or at the trailing edge.

163. The tapered "Emulsitator" knife has been constructed for use and used in the "Emulsitator" machines and includes the structure of each of claims 1 to 7, inclusive, 16 and 19 to 22, inclusive.

Turner 326–330, 340–341, 344–346; R. 602–605; PX–19; PX–20; PX–21; PX–25; PX–37; PX–38; PX–83.

164. With respect to claims 8 and 9, the non-tapered "Emulsitator" knife of defendants, or either of them, has a narrow pressure pocket and includes the structure of each of these claims.

The tapered "Emulsitator" knife of defendants or either of them, also includes the structure of each of these claims.

165. The following chart outlines the structure of apparatus claims 10 to 15, inclusive, 17, 18, 23 and 24. The symbol "X" shows that the structure set forth in the headings of the chart is present in the designated claims.

| Claim | Knife Is Tapered | Hydrodynamically Balanced Knife | Knife Has Pressure Heel or Pocket | Knife Is Wider Than High | Knife Has Chisel Trailing Edge | Knife Has Rearward Slope From Leading Edge | Knife Is Shaped to Oppose Movement Outwardly | Knife Has Axially Gathering Surface | Supply Chamber, Comminutiary Chamber, Perforate Valve Plate and Discharge Chamber with Expeller and Outlet | Seal | Sealable Discharge Opening |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | X | X | X | | | | | | | | X |
| 11 | X | X | X | | | | | | X | | X |
| 12 | X | X | X | | | | | | X | | X |
| 13 | X | X | X | X | | X | | | X | | X |
| 14 | | | X | X | | | X | X | X | | X |
| 15 | | | | X | | X | | | X | | |
| 17 | X | X | | | X | | X | X | X | | |
| 18 | X | X | X | | | | | | X | X | |
| 23 | X | X | | | | | | | X | | |
| 24 | X | X | | | | | X | X | X | | |

166. Referring to the chart of the apparatus claims of the preceding Finding in added detail, apparatus claims 10 to 15, inclusive, 23 and 24 include the knife substantially as defined in claims 1, 2, 4, 6, 7, 8, 19 and 21, respectively.

167. Claims 17 and 18 include a tapered, hydrodynamically balanced knife

substantially as set forth in knife claim 16 with cutting arms that are wider than they are high. These apparatus claims also include a reservoir portion, a comminuting portion, a discharge portion with an outlet, a perforate valve plate with a multiplicity of small openings therein that separates the comminuting portion from the discharge portion, and an expeller in the discharge portion.

168. Claims 10 to 15, inclusive, state that the discharge outlet is sealable against ingress of air when meat material passes through it during operation of the apparatus.

169. Claim 18 points out that drive means for the knife is sealed with respect to the discharge portion, the knife and expeller are operatively connected with the drive means, and the food product that is processed in the apparatus forms a continuous column in the apparatus which is free from ingress of air during operation.

170. With respect to each of claims 10 to 14, inclusive, 17, 18, 23 and 24 of Patent 2,934,121, defendants, or either of them, have the structure of each of these claims in the "Emulsitator" machines of each of Drawings A–1 and B–1, each of which machines have a tapered "Emulsitator" knife.

Turner 307, 326–330, 331, 336, 340–341, 344–346; R. 602–605; PX–19; PX–20; PX–21; PX–25; PX–37; PX–38; PX–83.

171. With respect to claim 15 of Patent 2,934,121, the "Emulsitator" machines shown in Drawings A–2 and B–2 each have the structure recited in the claim. Also, the "Emulsitator" machines shown in Drawings A–1 and B–1 each have the structure recited in the claim.

Infringement of Patent 2,840,318

172. U. S. Patent 2,840,318 to Schnell concerns comminuting apparatus having a sloping recirculating wall above or in advance of the knife.

173. Plaintiffs allege infringement of claim 2.

174. The controversy is whether defendants' machines have a comminuting chamber that includes an inwardly and upwardly inclined, substantially frusto-conical, recirculating surface positioned slightly above or in advance of the knife (DX–112). Defendants deny that their machines include such structure, but their machines do have this structure.

See annotations for Findings 91, 119 and 120; Turner 308–311, 329–332; Fishleigh 2744–2747; PX–18; PX–19; PX–20; PX–83.

175. The structure called for in claim 2 is present in all of the "Emulsitator" machines. There is no requirement in the claim that the inclined recirculating wall must extend all the way around the neck. Defendants also admitted that they must use this structure, since the 90° curved elbow (PX–160, PX–66) which they tried did not function properly. The defendants, or either of them, did not show that their replacement of the unsatisfactory 90° elbow did not give them improved results.

R. 192, 598, 599; Turner 258, 310, 311; PX–50, pages 2 and 3; PX–66; PX–160; See annotations for Findings 68, 91, 119 and 120.

176. The Ft. Worth "Emulsitator" machine and the "Emulsitator" machines shown in Drawings A–1, A–2, B–1 and B–2, each include the structure of claim 2 of Patent 2,840,318.

See annotations for Findings 174 and 175; PX–37; PX–38.

Infringement of Reissue Patent 24,764.

177. U. S. Reissue Patent 24,764 to Schnell concerns comminuting machines having specific lug structure.

178. Plaintiffs allege infringement of claims 1 to 3, inclusive, and 5 to 15, inclusive.

179. The issues as to claims 1 and 6 concern whether defendants' machines include (a) a wall that slopes inwardly and away from the perforate plate and, (b) at least one lug that projects inwardly from the sloping wall to closely overlie the outer end of the knife arm and has

an appreciable vertical dimension and a lateral face (DX–113). Defendants' machines include both structures as claimed, although they deny this (DX–113).

Turner 194–202, 323, 325–328, 332–334, 340–343, 500–501; PX–18; PX–19; PX–20; PX–28; PX–37; PX–38; PX–83; See annotations for Finding 175.

180. The Ft. Worth "Emulsitator" machine and the "Emulsitator" machines of Drawings A–1 and A–2, each include lugs that project from the sloping wall to closely overlie the ends of the arms of the knife and provide recirculation, as claimed, and thus include the structure of claims 1 and 6 of Reissue Patent 24,764.

See annotations for Finding 179.

181. Claims 7 and 8 are dependent upon claim 1. Claim 7 adds to claim 1 that a plurality of lugs extend inwardly over the path of the cutting arm of the knife. Claim 8 adds to claim 1 that the wall that slopes inwardly of a circular wall of the comminuting portion and away from the perforate plate is also circular. Defendants deny (DX–113) that their machines include such structures of claims 7 and 8 (DX–113). Their machines do include such structures.

See annotations for Finding 179.

182. The spaced-apart "vanes" in the neck of the "Emulsitator" machines of Drawings A–1 and A–2 are, in fact, lugs in shape and function. The neck portion of the Ft. Worth machine and the "Emulsitator" machines of Drawings A–1 and A–2 is circular.

Sondej 3313, 3317; PX–18; PX–19; PX–20; PX–28; PX–83.

183. The Ft. Worth "Emulsitator" machine and the "Emulsitator" machines of Drawings A–1 and A–2 each include the structures of each of claims 7 and 8 of Reissue Patent 24,764.

See annotations for Findings 179 and 182; PX–37; PX–38.

184. The issues as to claim 2 are whether defendants' machines have (a) at least one lug that projects inwardly into the intermediate portion of the machine to overlie the outer end of the knife arm and is in shearing clearance with the upper or leading cutting edge of the arm, and (b) the lug has an appreciable verticle dimension and lateral face (DX–113). Defendants' machines have such lug structure in shearing clearance with the knife. For shearing to occur, the lug need not be separated from the knife by a distance less than that of the thickness of the normal particle of meat material.

Turner 194–202, 292–313, 325–332, 334–337, 340–343, 500–501; PX–18; PX–19; PX–20; PX–28; PX–83.

185. The Ft. Worth "Emulsitator" machine, the "Emulsitator" machines of Drawings A–1 and A–2, and the "Emulsitator" machines of Drawings B–1 and B–2, each include the structure of claim 2 of Reissue Patent 24,764.

See annotations for Finding 184; PX–37; PX–38.

186. The issues as to claim 3 are whether defendants' machines have (a) a tapered knife, (b) a wall spaced from the knife arms that slopes inwardly and away from the plate, (c) a plurality of lugs projecting inwardly from the sloping wall and having a surface that closely overlies and is in shearing clearance with the tapered outer ends of the knife arms, and (d) the lugs have an appreciable vertical dimension and a lateral face. Defendants' machines have such structures, although they deny this (DX–113).

See annotations for Findings 163, 174, 175 and 184; Turner 196–199, 202–206; PX–18; PX–19; PX–20; PX–83.

187. Claim 9 is dependent upon claim 3 but presents the additional issue of whether the wall that slopes inwardly of the comminuting portion and away from the perforate plate is also circular. Although defendants deny that their machines have such structure (DX–113), they do include the circular sloping wall claimed.

See annotations for Findings 175 and 180.

188. The Ft. Worth "Emulsitator" machine and the "Emulsitator" machines of Drawings A–1 and B–1, each have a tapered knife and include the structure of each of claims 3 and 9 of Reissue Patent 24,764.

See annotations for Finding 163; Turner 196–199, 202–206; PX–18; PX–19; PX–20; PX–37; PX–38; PX–83.

189. The issues as to claim 5 are whether defendants' machines include (a) a peripheral wall that extends upwardly from the plate and has a portion extending inwardly to the reservoir portion above or in advance of the knife, and (b) the peripheral wall has at least one inwardly projecting lug that is in shearing relation with respect to the upper edge of the knife (DX–113). The knife is defined as being tapered. Defendants' machines include such structures despite defendants' denial of this (DX–113).

See annotations for Findings 184 and 187.

190. Claim 10 is similar to claim 5 but presents the additional issue of whether defendants' machines have a cylindrical wall that defines a connection between the reservoir and the wall from which the lugs extend (DX–113). Defendants' machines include such structures although they contend otherwise (DX–113).

PX–18; PX–19; PX–20; PX–83.

191. The Ft. Worth "Emulsitator" machine and the "Emulsitator" machines of Drawings A–1 and B–1, each include a tapered knife and the structure of each of claims 5 and 10 of Reissue Patent 24,764.

See annotations for Finding 163; Turner 196–199, 202–206; PX–18; PX–37; PX–38.

192. The issues as to claims 11 to 13 are whether defendants' machines include (a) a recirculatory surface adjacent the knife arm that extends inwardly and upwardly relative to the plate, and (b) the comminuting portion includes at least one lug that is in shearing relationship with the leading or upper cutting edge of the knife (DX–113). Claim 12 is dependent upon claim 11 but adds thereto that the lug extends from the recirculatory surface of the "intermediate comminuting portion." Defendants have these structures of claims 11 to 13, although they deny it (DX–113).

See annotations for Findings 91, 119, 120, 174, 175 and 184; PX–37; PX–38.

193. Claims 14 and 15 are similar to claims 11 and 12, respectively. The issues as to claim 14 concern whether defendants' machines have (a) a recirculatory surface spaced from the knife that extends inwardly toward the axis of rotation of the knife and away from the perforate plate, and (b) at least one lug that extends from the comminuting portion that lies in the path of material circulated by the knife (DX–113). Claim 15 is dependent upon claim 14 but presents the additional issue that a lug must extend from the recirculatory surface of the comminuting portion (DX–113). Defendants' machines include these structures of claims 14 and 15, although defendants deny it (DX–113).

See annotations for Findings 91, 119, 120, 174, 175 and 180; PX–37; PX–38.

194. The upper cutting edges of the tapered and non-tapered knives used in "Emulsitator" machines include a portion at the outer ends of the arms that extend downwardly toward the lower cutting edges. Mr. Schnell pointed out to the Patent Office that his knife also had an upper cutting portion that extended toward the lower edge at the outermost ends of his knife arms. Mr. Schnell stated, for example, at page 27 of DX–15:

"It is obvious, of course, that the upper cutting edge includes that portion of it at the tip, whether that portion is abruptly bent as in Figure

3 or whether the upper cutting edge is smoothly curved from beginning to end."

Turner 293, 343–346; PX–25.

195. The Ft. Worth "Emulsitator" machine and the "Emulsitator" machines of Drawings A–1, A–2, B–1, and B–2, each include the structure of each of claims 11 to 15, inclusive.

See annotations for Findings **192** and **193**; PX–37; PX–38.

U. S. History of Schnell's Patents.

196. The history of Schnell's patent applications in the U. S. Patent Office (PX–3) is shown in Chart A below. This chart shows when the applications were filed, the chain or sequence in which they were filed, and when they issued as patents.

CHART A.

## U. S. HISTORY OF SCHNELL PATENTS

Description in Schnell's U. S. Patents.

197. The descriptive portion of each of Patents 2,840,318, 2,906,310, 2,934,120, 2,934,121, 3,044,514 and each of Reissue Patents 24,683 and 24,764, contains a written description of Mr. Schnell's inventions and of the manner and process of making and using them in such full, clear, concise and exact terms as to enable any person skilled in the art to which they pertain or with which they are most closely connected to make and

use the same and sets forth the best mode contemplated by Mr. Schnell of carrying out his inventions.

Prior Art Relied Upon by Defendants.

198. The following Table I (PX–174) shows the patents relied upon by the defendants, shows when the patents issued, briefly identifies their subject matter, states whether the reference was before the patent examiner when the Schnell cases were considered, and shows whether the examiner searched prior art that included these patents.

PX–174; PX–175; PX–176; DX–11; DX–12; DX–13; DX–14; DX–15; DX–16; DX–17; DX–18; DX–19; DX–20.

TABLE I

PATENTS RELIED UPON BY DEFENDANTS

*Schnell Patents — Identified by Number in Table I:

| *Schnell Patents | Identified by Number in Table I |
| --- | --- |
| 2,840,318 | 1 |
| (2,842,177 | 2 |
| (Re.24,764 | 3 |
| 2,906,310 | 4 |
| 2,934,120 | 5 |
| 2,934,121 | 6 |
| Re.24,683 | 7 |
| 3,044,514 | 8 |

| DX No. | Patent | Country | Alleged Inventor | Date Patented | Subject Matter | Cited by U.S. Patent Office or Brought to Its Attention During Pendency of a Schnell Appln. That Later Issued as Following Schnell Patents * | Not Cited by the Patent Examiner But Included in Classes & Sub-Classes of U.S. Patents Searched by Patent Office * |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1. 53 & 53A | 17,002 | Sweden | Schyia | 1-23-04 | Worm feeding meat grinder. | 6 | |
| 2. 54 | 179,437 | Austria | Hortnagl | 8-25-54 | Green feed and beet comminuter. | 1, 3, 4, 5, 6, 7, 8 | |
| 3. 55 | 254,807 | Great Britain | Hetherington | Accepted 7-9-26 | Worm feeding meat grinder. | | |
| 4. 25 | 419,103 | U.S. | Baltzley | 1-7-1890 | Hand operated grinder for food. | 5 | |
| 5. 26 | 459,450 | U.S. | Steigert | 9-15-1891 | Worm feeding meat grinder. | 3, 5, 6, 7, 8 | 6 |
| 6. 27 | 473,049 | U.S. | Zies | 4-19-1892 | Hand operated, worm feeding meat grinder. | | |
| 7. 56 & 56A | 534,013 | Belgium | Schnell | 12-31-54 | Agricultural food comminuter. | 4, 5, 6, 7, 8 | 5, 6 |
| 8. 57 & 57A | 585,231 | Germany | Straeten | 9-30-33 | Worm feeding meat grinder. | 5, 6, 8 | |
| 9. 58 & 58A | 669,256 | Germany | Westendorp | 12-20-38 | Worm feeding meat grinder | 5 | |

| | DX No. | Patent | Country | Alleged Inventor | Date Patented | Subject Matter | Cited by U.S. Patent Office or Brought to Its Attention During Pendency of a Schnell Appln. That Later Issued as Following Schnell Patents* | Not Cited by the Patent Examiner But Included in Classes & Sub-Classes of U. S. Patents Searched by Patent Office* |
|---|---|---|---|---|---|---|---|---|
| 10. | 28 | 745,079 | U.S. | Smith | 11-24-03 | Crank driven, worm feeding meat grinder. | 1, 3, 5, 6, 7, 8 | |
| 11. | 29 | 756,713 | U.S. | Sander | 4-5-04 | Hand operated, worm feeding meat grinder. | 5, 6, 8 | |
| 12. | 30 | 820,990 | U.S. | Sander | 5-22-06 | Worm feeding meat grinder. | | 5, 6 |
| 13. | 31 | 930,799 | U.S. | Sander | 8-10-09 | Hand operated, worm feeding meat grinder. | 4, 5, 6, 8 | |
| 14. | 32 | 1,130,024 | U.S. | Schock | 3-2-15 | Hand operated, worm feeding meat grinder. | | 1 |
| 15. | 33 | 1,796,677 | U.S. | Wilson | 3-17-31 | Worm feeding meat cutter or blender that chops season-ing and previously cut meat. | | |
| 16. | 34 | 2,075,603 | U.S. | Dirr | 3-30-37 | Worm feeding meat grinder. | 1 | |
| 17. | 35 | 2,090,578 | U.S. | Eppenbach | 8-17-37 | Colloidal grinding mill. | | 1, 5, 6 |
| 18. | 36 | 2,092,992 | U.S. | Thalman | 9-14-37 | Mixing or emulsi-fying unit for difficulty mis-cible materials such as petro-leum asphalt and water. | | 4 |
| 19. | 37 | 2,183,114 | U.S. | Bonapace | 12-12-39 | Worm feeding meat grinder. | 1, 5 | |
| 20. | 38 | 2,220,729 | U.S. | Powers | 11-5-40 | Garbage disposal unit. | 4, 7, 8 | |
| 21. | 39 | 2,322,058 | U.S. | Powers | 6-15-43 | Garbage disposal unit. | 4 | 1, 3, 7, 8 |

| DX No. | Patent | Country | Alleged Inventor | Date Patented | Subject Matter | Cited by U.S. Patent Office or Brought to Its Attention During Pendency of a Schnell Appln. That Later Issued as Following Schnell Patents* | Not Cited by the Patent Examiner But Included in Classes & Sub-Classes of U.S. Patents Searched by Patent Office* |
|---|---|---|---|---|---|---|---|
| 22. 40 | 2,421,064 | U.S. | Hilliker | 5-27-47 | Garbage disposal unit, submerged in water. | | |
| 23. 41 | 2,428,420 | U.S. | Green | 10-7-47 | Garbage disposal unit. | | 1, 2, 3, 4, 5, 6 |
| 24. 42 | 2,485,226 | U.S. | Weeden | 10-18-49 | Icing digester extruder for ejecting icing on cakes and pastry. | | 1, 3, 4, 7, 8 |
| 25. 43 | 2,496,359 | U.S. | Rymann | 2-7-50 | Disintegrator for waste water and sewage. | 4 | 1, 3, 5, 6, 7 |
| 26. 44 | 2,594,250 | U.S. | Tranbarger | 4-22-52 | Garbage disposal unit. | 3, 4, 5, 6, 8 | 1, 7 |
| 27. 45 | 2,624,384 | U.S. | Ward | 1-6-53 | Worm feeding grinder for food, washing powder, soap chips, etc. | 1, 2, 3, 4, 7, 8 | |
| 28. 46 | 2,658,453 | U.S. | Walters | 11-10-53 | Nonclogging pump for use in oil refineries. | | 5, 6 |
| 29. 47 | 2,665,725 | U.S. | Lundell | 1-12-54 | Worm feeding food grinder. | 1, 3, 5, 6, 7, 8 | |
| 30. 48 | 2,749,053 | U.S. | Reith | 6-5-56 | Colloid grinding mill. | | |
| 31. 49 | 2,814,449 | U.S. | Wieczorek | 11-26-57 | Garbage disposal unit. | 4 | |
| 32. 50 | 2,916,069 | U.S. | Williams | 12-8-59 | Worm feeding food grinder. | | |
| 33. 51 | 2,938,558 | U.S. | Urschel | 5-31-60 | Meat comminuter. | | 5, 6 |
| 34. 52 | 2,977,056 | U.S. | Gustke | 3-28-61 | Colloid mill with pre-cutter. | | 1, 3, 4, 8 7, 8 |

199. As shown in Table I of the preceding Finding, 19 of the 34 patents being relied upon by defendants were granted prior to 1940, and 19 of these 34 patents were cited by the U. S. Patent Office or were brought to its attention during the prosecution of Schnell's patent applications and at least 11 other of these 34 patents were included in the U. S. patent examiner's prior art search (in at least one pending Schnell application). Only 4 of these 34 patents, namely British Patent 254,807, Thalman Patent 2,092,992, Walters Patent 2,658,453, and Reith Patent 2,749,053, were not included in an examiner's search or were not cited by an examiner.

200. The prior art patents and publications and devices relied upon by defendants at the trial, singly or in combination, were not shown by defendants to be more pertinent to the validity of the claims here in suit than the art cited or considered by the Patent Office.

201. The defendants have relied upon a vast number of alleged prior art (patents, publications and devices). None of this art shows or teaches the inventions set forth in the claims in suit. None of this art would properly have suggested to a person skilled in the art, at the times of the inventions thereof by Schnell, the inventions of the claims in suit.

202. Some of the prior art relied on shows piecemeal and separately some of the features which Schnell so successfully and unexpectedly combined, but no one before Schnell showed or appreciated how those features could successfully be combined—much less produce the results obtained first by Schnell. This art thus does not properly disclose or suggest, collectively, to a person skilled in the art, at the times of the inventions thereof by Schnell, the inventions of the claims in suit.

203. The following claims of the identified patents are directed to and define a new and patentable combination of functionally cooperating elements or steps, which combination would not have been obvious to one skilled in the art, based on knowledge of the asserted prior art patents and publications and devices introduced in evidence by defendants, or either of them:

Patent 2,840,318: claim 2;

Patent 2,906,310: claims 1–8;

Patent 2,934,120: claims 1 and 2;

Patent 2,934,121: claims 1–24;

Re. Patent 24,764: claims 1–3 and 5–15;

Patent 3,044,514: claims 1–15, 17 and 18; and,

Re. Patent 24,683: claims 1–16.

Grinders.

204. The first and greatest distinction shown between the grinder and the emulsifier of the patents in suit is implicit in the very words which describe them. A grinder simply subdivides or comminutes a material from one size into a smaller size. The meat grinder may be able to subdivide meat into particles as small as one wishes by making the holes in the plate as small as desired. However, this will not make a satisfactory meat emulsion. To produce a satisfactory emulsion, the ingredients must not only be reduced to a particular small size, but these particles must be intermingled and thoroughly mixed.

Turner 163–174; PX–4; PX–9.

205. The following patents show grinders: Schyia Patent 17,002 (DX–53 and –53A); Hetherington Patent 254,807 (DX–55); Baltzley Patent 419,103 (DX–25); Steigert Patent 459,450 (DX–26); Zies Patent 473–049 (DX–27); Straeten Patent 585,231 (DX–57 and –57A); Westendorp Patent 669,256 (DX–58 and –58A); Smith Patent 745,079 (DX–28); Sander Patents 756,713 (DX–29), 820,-990 (DX–30) and 930,799 (DX–31); Schock Patent 1,130,024 (DX–32); Wilson Patent 1,796,677 (DX–33); Dirr Patent 2,075,603 (DX–34); Bonapace Patent 2,183,114 (DX–37); Ward Patent 2,624,384 (DX–45); Lundell Patent 2,665,725 (DX–47); and Williams Patent 2,916,069 (DX–50).

206. It was conceded by defendants that no grinder reference teaches recirculation.

Fishleigh 2772.

207. The grinders will not produce a meat emulsion. Their knives rotate at a slow speed.

Colloid Mills.

208. The colloid mill is a grinding machine in the millstone sense of the word as distinguished from meat grinders.

209. The colloid mill depends for its action upon the tearing and abrasion caused between two surfaces having material caught between them. It is a machine in which emulsions of uniformity can be produced, but it has not had any substantial utility in the forming of sausage emulsions and it works on entirely different principles from the emulsifiers involved in this suit.

210. The colloid mills of Eppenbach Patent 2,090,578 (DX–35), Reith Patent 2,749,053 (DX–48), and Gustke Patent 2,977,056 (DX–52), do not show the methods or apparatus involved in the present suit, nor do they show their results.

211. Gustke Patent 2,977,056 (DX–52) as apparently cited for the plate and knife that are described as a crushing mill to prepare material for a colloid mill. The crushing mill is placed above a colloid mill as a pre-crusher and not as an emulsifier. There is no mention of recirculation; there is no statement in the patent that the plate causes a back pressure; there is no mention of a hydraulic column; and, there is no mention of the need of a hydraulic column. Further, there is no mention of the speed of the rotating parts.

Icing Extruder, Mixer for Liquids and Pump for Oil Refineries.

212. Weeden Patent 2,485,226 (DX–42) concerns a machine for extruding icing onto cakes and is clearly not pertinent to Schnell's inventions.

213. Thalman Patent 2,092,992 (DX–36) does not concern emulsifying meat. It is directed to a device for mixing immiscible liquids such as petroleum asphalt and water. The liquids enter the device through two small pipe inlets 23 and 24 which may be suitable for liquid but certainly not chunks of meat.

214. Walters Patent 2,658,453 (DX–46) is directed to a pump for use in oil refineries. It refers to a structure for straining the material fed to the pump. More specifically, it concerns the use of a rotating worm or vanes with a perforate plate for disintegrating solids so as to prevent the pump from becoming clogged. The patent does not concern itself with emulsifying meat and it does not state that recirculation is desired or obtained.

Garbage Disposal Devices.

215. Defendants have relied upon art directed to garbage and waste disposal devices. Producing a wholesome consumer product is significantly dissimilar to the treatment of garbage, and in fact they are incompatibly opposed. One deals with production of a desirable new product, the other with elimination of an undesired product. In emulsifying meat, one wishes to avoid producing garbage. The "Mince Master" machines and "Emulsitator" machines preserve the nutritive value of a salable commodity, whereas a disposal device destroys a substantially worthless nuisance. A disposal device may make garbage fit for pigs, but an emulsifier must make pigs fit for human consumption. The patented machines must, and do, operate with a prescribed limit of moisture and with a minimum critical temperature rise. Garbage disposal devices are constructed to flush waste material down the drain with a large propelling amount of water without concern as to a rise in temperature. The very nature of the disposal machine brings about the comminution of softer materials first and their elimination from the system, followed by harder materials, especially bones.

Fishleigh 2276, 2729, 2730; DX-59, page 9.

216. The garbage disposal devices require that a continuous stream of water be fed into these devices for proper operation. When defendants ran their last

minute ex parte tests using garbage in the "Mince Master" and "Emulsitator" machines, they did not run the machines as they use them in making a meat emulsion, but needed and provided a continuous stream of water.

Schmidt 3458, 3460; DX-59, page 9.

217. Mr. Schmidt of Eckrich showed that garbage disposal units did not produce an emulsion. He testified that even when garbage was put through the "Emulsitator" machine or "Mince Master" machine, it quickly separated, the greasy scum settling to the top of the water and solids settling to the bottom.

Schmidt 3459, 3555–3557.

218. The garbage disposal devices relied on by defendants and the emulsifiers here in suit have an entirely different function and purpose and, in spite of the magnification of certain superficial similarities, the disposal devices do not do the same job—nor do they perform the same function—nor do they work in the same way.

219. No credible evidence was presented at the trial that any of the garbage disposal devices could be or have been used to produce satisfactorily a meat emulsion suitable for making sausages and the like or produce or provide a hydraulic column of meat material when operated as intended.

220. The following art relates to garbage disposal devices: Powers Patents 2,220,729 (DX-38) and 2,322,058 (DX-39); Hilliker Patent 2,421,064 (DX-40); Green Patent 2,428,420 (DX-41); Tranbarger Patent 2,594,250 (DX-44); Wieczorek Patent 2,814,449 (DX-49); and the G. E. "Disposall" device (DX-148) and corresponding G. E. "Disposall" Manual (DX-59).

221. Not one of these references describes or shows a hydraulic column either under that name, or any other equivalent representation.

### Garbage Disposal Device of Tranbarger Patent 2,594,250.

222. The Tranbarger patent (DX-44) comes closest to showing the existence of liquid above the disintegrating area, since in the drawings there is some representation of liquid being in the upper chamber 18. This, however, was not substantiated in the specification and there is no indication that once the pump started there would be any liquid level at this point. The Tranbarger patent was thoroughly considered by the Patent Office, Table I, page 928 above, and found to be not applicable. It was not less relevant than the "Disposall" device, but Mr. Fishleigh, defendants' patent expert, apparently chose to speak of the "Disposall" unit because it had not been mentioned, as such, by the Patent Office.

DX-11; DX-12; DX-13; DX-15; DX-16; DX-19.

### G. E. Garbage "Disposall" Device.

223. The G. E. "Disposall" Manual (DX-59) not only fails to mention a hydraulic column, but gives clear directions making the existence of one under ordinary operations impossible.

224. Mr. Fishleigh, defendant's patent expert, conceded the following facts:

(a) The "Disposall's" drain will remove ten gallons of water per minute.

(b) The directions are to add 1½ gallons of water per minute (DX-59, page 9) which is controlled by a setting and also by reason of the fact that there are only small openings in the "Twistop" closure. The directions indicate that one should pass only cold water into the machine. In order to get as much as ten gallons per minute to enter the unit, Mr. Fishleigh had to disregard this and turned on both his hot and cold water faucets full blast. Under ordinary operation with the device, no liquid level develops in the disintegrating chamber. The clatter which is produced by hard particles such as bones flying around inside the device is a common sound heard from the disposal device. If the device was full of

water there would be no such clatter.

(c) If there was a hydraulic column in the "Disposall" device, the motor would be entirely inadequate and would automatically blow a fuse. The motor also has an overload button which in defendants' ex parte experiments automatically stopped the motor within a few seconds when the creation of a hydraulic column was attempted.

(a) Fishleigh 2276.

(b) Fishleigh 2276, 2618, 2620, 2706, 2723, 2736.

(c) Fishleigh 2727.

225. Defendants, in their ex parte tests, did not operate the "Disposall" device with the "Twistop" in its intended position. They could not and did not get a hydraulic column with the "Twistop" in place.

Fishleigh 2706–2708, 2722.

226. The machine as built and as intended to be used will not operate without the "Twistop" in position. The "Twistop" starts the machine by actuating a switch.

DX-59, pages 6, 7.

227. The "Disposall" device does not have a propelling knife and stationary perforate plate. No credible evidence was presented showing that the asserted art suggested restricting the drain openings of the device to such an extent that the device will create the back pressure explicit in the operation of Schnell's emulsifier and the "Emulsitator" machines.

DX-59; DX-148.

228. The "Disposall" device will not operate as intended without a steady flow of water into the system.

DX-59, page 9.

229. The "Disposall" device was not designed, adapted or used for the performance of the functions of the inventions here in suit.

230. While the "Disposall" unit was not cited as such by the Patent Office, elements found in it were present in the related art cited, such as DX-38, DX-39, DX-44 and DX-49, mentioned above, all of which were cited by the Patent Office or brought to the attention of the Patent Office by Schnell.

Garbage Disposal Device of Hilliker Patent 2,421,064.

231. Meat is not fed into the Hilliker device (DX-40) under its own head. Garbage, however, falls into it under the exigencies of the situation. It is suspended in a mixture of aerated, bubbling water and garbage. Mr. Fishleigh, defendants' patent expert, described a bubble properly under cross-examination as being a globule of gas or air within a liquid.

Fishleigh 2516–2517.

232. The Hilliker device then sucks the garbage through a plate having an unspecified hole area, against the efforts of a cutter which tends to push it back away from the entrance of the plate. The device then propels whatever comes through the plate into the air as a fountain from which it routinely returns.

233. At some stage, some greasy garbage may overflow the outlet in a trickle corresponding to the trickle of water coming in. Ex parte tests conducted by Mr. Schmidt of Eckrich on the use of the "Emulsitator" machine show that if garbage is emulsified in water, a greasy scum will float to the top while the bulk of the garbage will sink to the bottom. This means, at best, the Hilliker machine would float a greasy mass to the overflow and clog it, while the garbage would sink to the bottom where it would collect.

Schmidt 3459, 3555–3557.

234. The level of the overflow is nowhere specified in relationship to the plate. As soon as the device starts to operate, the material is going to be thrown out at a high rate because the discharge 38 is quite large—which will lower the liquid level and draw air through the plate. Furthermore, the patent spe-

cifies that the material coming from the fountain is bubbling, and bubbling means liquid enclosing a globule of gas.

235. It is not evident how this apparatus teaches anything with respect to the production of a uniform, edible meat emulsion.

236. Defendants did not present any evidence of having used or tested the Hilliker device as shown. No proof was presented that Hilliker ever treated garbage in his device. There is nothing in the Hilliker patent to indicate that Hilliker intended to have a hydraulic column or that his device would work if it did have one. The Hilliker device as shown in his patent cannot be made to work for making an edible sausage emulsion.

The Sewage Disintegrator of Rymann Patent 2,496,359.

237. Rymann Patent 2,496,359 (DX-43) concerns a sewage disintegrator and was cited and thoroughly discussed in the Patent Office. There is certainly no indication that the large openings 8 shown in Fig. 2 of the Rymann patent would not be perfectly adequate to receive the entire amount of material supplied to it without creating any back pressure or recirculation. In fact it would be obviously undesirable to have a substantial pressure drop in an ordinary sewage system. The sole purpose of Rymann is to produce particles which are no larger than the rather large openings 8 in the plate 7. The invention claimed by Rymann concerns the means for adjusting his cutter elements.

DX-11, pages 96, 97; DX-15, pages 15, 16, 27, 30, 31, 35, 37, 39–43, 45, 51–56; DX-17, pages 102–105, 115–121, 124–128, 146, 147, 166, 175–189, 190, 194; DX-18, pages 77, 80, 81, 95, 98–100, 115, 116.

Fodder and Beet Mill of Austrian Hortnagl Patent 179,437.

238. The Hortnagl patent (DX-54 and -54A) does not teach that a meat emulsion can be produced with his device. Hortnagl does not teach how to produce an emulsion. He does not teach

the principles of Schnell's inventions here in suit because he deliberately introduces air so that "the air which enters through the air entry slot 16" conveys crushed ("zerkleinert") "pulp" materials toward and out through the discharge nozzle 17. He does not state what the size is of the opening in his perforate plate. The Hortnagl device is simply the old hammermill which everyone on a farm is familiar with, in which air-borne material is dropped into the path of a rapidly rotating hammer or beater.

239. Hortnagl taught that one must use air and that the air served a useful function. Decidedly and definitely Hortnagl leads away from Mr. Schnell's discovery of his hydraulic column.

240. If Hortnagl knew anything about a hydraulic column, he certainly told the world to avoid it and except for Schnell the world did so.

241. Defendants did not present any evidence of having used or tested the Hortnagl device as shown.

Defendants' Specially Constructed Machine of DX-149.

242. In building a specially constructed machine (DX-149) for the trial, the G. E. "Disposall" unit (DX-148) was drastically changed by defendants. The specially constructed machine included parts allegedly taken from the Hortnagl patent and other significant changes and parts not shown in either or both the G. E. "Disposall" Manual (DX-59) or Hortnagl patent (DX-54 and -54A).

Fishleigh 2703–2718.

243. There is no disclosure in either the G. E. Manual (DX-59) or Hortnagl patent (DX-54 and -54A) or any other reference relied on by defendants, that shows or suggests combining the disclosures of the Manual with the Hortnagl patent.

Fishleigh 2700; DX-59.

Schnell Is the Original, Sole and First Inventor.

244. Carl Schnell is the original, sole and first inventor of the inventions of each of the claims in suit.

The Claims in Suit Cover Schnell's Inventions.

245. Each of the claims in suit particularly point out and distinctly claim the subject matter of Schnell's inventions.

Aggregation and Exhausted Combination Defenses.

246. Each of the claims in suit are directed to and define a new and patentable combination of functionally cooperating elements or steps that produce a new and unitary structure or result.

Double Patenting Defense.

247. With respect to each of the claims in suit, each of the inventions claimed in any one of the patents is directed to subject matter that is separate and patentably distinct from the subject matter of any claim of any of the other patents, and none of the claims of any one of the patents reads in terms or in substance on any of the inventions claimed in any of the other patents.

248. The applications for all of the Schnell patents in suit, except Reissue Patent 24,683, were examined in the same examining division of the Patent Office and in most instances by the same examiner. The examiners were aware of all of the Schnell applications pending in the U. S. Patent Office and Schnell's issued U. S. patents. The Patent Office is well qualified to determine double patenting and found that there was none.

DX-11; DX-12; DX-13; DX-14;
DX-15; DX-16; DX-17;
DX-18; DX-19.

Intervening Rights Defense.

249. Defendants did not present evidence that shows that both or either of them have any intervening rights with respect to any claim in suit.

250. Allbright-Nell was repeatedly warned by Griffith, at least as early as March, 1957, that Schnell expected to be granted patents in the U. S. and that Schnell would defend his U. S. patents. Despite these warnings, Allbright-Nell deliberately continued its activities of copying the Schnell emulsifier and was

later joined and assisted in this endeavor by Eckrich.

Griffith 532, 533; PX-40.

251. "Emulsitator" machines made, used or sold in the U. S. by defendants, or either of them, at and following the issuance of Patent 2,842,177, included the structure of each of claims 1 to 3, inclusive, of Reissue Patent 24,764, which claims originally appeared in Patent 2,-842,177, the patent that was reissued.

See annotations for Findings 180,
185 and 188; DX-15; DX-16;
PX-37; PX-38.

252. The inventions of claims 5 to 15, inclusive, of Reissue Patent 24,764, each of which are reissue claims, are properly disclosed in the U. S. application, as filed, that issued as Patent 2,-842,177.

DX-15; DX-16.

253. "Emulsitator" machines made, used or sold in the U. S. by defendants, or either of them, at and following the issuance of Patent 2,836,825, were constructed for use in practicing the method of each of claims 1 and 2 of Reissue Patent 24,683, which claims originally appeared in Patent 2,836,825, the patent that was reissued.

See annotations for Finding 138.

254. Eckrich practiced in the U. S. the method of each of claims 1 and 2 of Reissue Patent 24,683 at and following the issuance of Patent 2,836,825.

See annotations for Finding 138.

255. The inventions of claims 3 to 16, inclusive, of Reissue Patent 24,683, each of which are reissue claims, are properly disclosed in the U. S. application, as filed, that issued as Patent 2,836,825.

DX-13; DX-14.

256. The Patent Office is well qualified to determine whether reissue claims 5 to 15, inclusive, and 3 to 16, inclusive, of Reissue Patents 24,764 and 24,683, respectively, were properly supported by the disclosures of the applications as filed that issued as the patents for which reissue was later sought and obtained.

The Patent Office found that these claims were so supported by the applications as filed.

257. The reissue applications that issued as Reissue Patents 24,764 and 24,-683, each satisfy the requirements of 35 U.S.C. § 251 and the Patent Office so held.

Defense Asserting Importance of Decision by German Patent Office.

258. Schnell filed in Germany a patent application (DX-298 and -298A) on June 15, 1956. It was approved by the German Patent Office and was published on May 14, 1958 as Display Copy 1,030,-218. An opposition was filed by another party against Display Copy 1,030,218 and the German Patent Office found during that proceeding that the claims (DX-298B and -298C) were not patentable. Schnell appealed from that decision but no decision has yet been rendered.

R. 3240–3241.

259. Each of the claims (DX-298B and -298C) that was before the German Patent Office during the opposition does not correspond in words or substance with any of the claims here in suit. The claims before the German Patent Office do not mention recirculation, do not mention or provide a perforate valve plate that creates back pressure and causes recirculation, and do not mention a hydraulic column or necessarily set forth the conditions that provide a hydraulic column. Further, the cooperative relationship of the elements is not defined with particularity.

260. The claims involved before the German Patent Office during the opposition proceeding are significantly different in terms and substance from the claims here in suit, and its decision is not relevant to any issue before this Court.

261. During the examination of the U. S. application that issued as Patent 2,906,310, the U. S. Patent Office rejected (Office Action of July 2, 1959) and Schnell cancelled (Amendment "G," filed July 20, 1959) claim 30 (Amendment "F," filed June 1, 1959). Claim 30 is *narrower in scope* than each of the claims involved in the opposition proceeding in the German Patent Office.

R. 3205–3208, 3217–3218; DX-11; DX-298C.

262. Even if the decision of the German Patent Office were relevant, which it is not, the granting of somewhat similar claims in Schnell's patents in Austria, Canada, Denmark and Norway (PX-177), which plaintiffs acknowledged were likewise irrelevant, indicates that the general subject matter of the German claims was deemed patentable by four other foreign countries.

PX-177; R. 3939–3940.

The Maeder Defense.

263. Mr. Schnell did not derive any invention here in suit from Mr. Maeder or any one else.

264. The most that can be said by defendants for the asserted Maeder defense is that in November of 1955, Mr. Reichert asked Schnell if Schnell's machine could be fitted with a direct means to stuff sausage casings with meat emulsion as it issued from the machine.

Schnell 1479–1480.

265. Neither Maeder nor Reichert showed any familiarity on the witness stand with the design of the Schnell machine.

266. Reichert's own testimony is contradictory and confusing. Maeder testified to nothing. But even if it were true that Reichert came to Schnell and said, "I would like to have you build a machine with a seal and a small outlet," he would not have been telling Schnell anything that Schnell did not already know concerning the operation of a machine with a hydraulic column.

267. The evidence is uncontradicted that long before any contact of Maeder or Reichert with Schnell, the Schnell machines were made with a seal. The seal had been discontinued in September of 1955 because of the fact that it could not be readily washed and took on a foul odor after use. But, in September Mr. Schnell had already sought a rubber seal (Goetz seal of DX-9) which could be

washed, and he was "pushing" the manufacturer to obtain it from that time on.

> Schnell 1484, 1486–1487, 1490; Bihler 1461, 1469, 1470, 1546; Furthmuller 1722; PX-125 and -125A; PX-126 and -126A; PX-127 and -127A; DX-6; DX-271A, pages 36–38.

268. Schnell knew at least several months before November of 1955 that if the discharge opening were obstructed, a hydraulic column would be formed and the machine would aspirate. At that time he did not want to sell machines so built because there was no demand for the powerful motor that would be necessary, or for the output that it would produce. Not only did Furthmuller corroborate him on this point, but the drawing of DX-1071 shows the machines with the seal.

> Schnell 1666–1670; Furthmuller 1705–1707; DX-271A, page 39; DX-271F, pages 500, 501.

269. The first machine demonstrated by Bihler to Maeder had a seal and this machine was built long before any contact between either Maeder or Reichert with Schnell.

> Bihler 1461, 1469, 1470, 1546.

270. Maeder knew nothing about machine design and his German application (DX-198 and -198A) not only has no drawing, but shows that Maeder did not know of any means by which he could accomplish his object of keeping the emulsion air-free.

271. If there would be any question as to whether Maeder taught Schnell anything, the testimony establishes that Maeder went back to a small machine "with a wide discharge" (DX-247 and -247A, page 2; DX-246 and -246A), abandoning any idea he may have had concerning an air-free emulsion.

272. Reichert's greatly refreshed recollection on those events which he chose to remember is hardly consistent with his failure to recollect things which should have been apparent to him. Not only did Reichert place the timing of the events by reference to a flood on which he was at least six months off, there being no flood in the Fall of 1955 but there being one on March 3, 1956, but he went out of his way to fix the date of the first interview with Schnell at least six weeks earlier than it actually occurred. Schnell's diary shows that his first meeting with Reichert was on November 23, 1955 and his second conference on November 28, 1955. The third meeting was one month later, a meeting completely forgotten by Reichert. The entries and particularly the sketches (PX-120) in Schnell's diary on November 23, 1955 confirm the fact that Schnell was then fully aware of the necessary problems and that he told Reichert what was involved. Reichert did not claim that the sketches were his and in fact when confronted with them, his memory failed. The sketches are consistent with the letter of December 5, 1955 (DX-205 and -205A) which defendants themselves produced. Reichert did not rebut this evidence. Reichert's statement that all he wanted Schnell to do was to make the "machine which Mr. Schnell was building," is contradictory to his other testimony. It is also significant that Maeder referred to the machine in later correspondence with Schnell as "your machine."

> Reichert 979, 983, 991; Schnell 1501, 1502, 1514; Furthmuller 1691; DX-205 and -205A; DX-208 and -208A; DX-248 and -248A.

## CONCLUSIONS OF LAW

Upon the foregoing Findings of Fact, the court makes the following Conclusions of Law:

1. The court has jurisdiction of the parties and the subject matter of this cause.

2. The patents in suit and the claims in issue as to each are valid and infringed by the defendants.

3. Plaintiffs are entitled to an injunction enjoining defendants from further infringement of said claims in issue of the patents in suit and are entitled to judgment for damages including costs

and interest and for an accounting to ascertain the amount thereof.

4. Plaintiffs are entitled to judgment on their complaint.

## INDEX

| | Page |
|---|---|
| The Parties | 892 |
| Ownership of Patents in Suit | 892 |
| The Actions | 892 |
| Claims in Suit | 893 |
| Sausage Industry | 893 |
| Schnell's Discoveries | 894 |
| Schnell's Discoveries Revolutionized the Sausage Industry | 895 |
| Introduction of Emulsifiers in the United States | 896 |
| History of the "Mince Master" and "Emulsitator" Machines | 897 |
| Description of the "Mince Master" Machines | 901 |
| Description of Anco "Emulsitator" Machines | 902 |
| Hydraulic Column in "Emulsitator" Machines | 913 |
| Recirculation in "Emulsitator" Machines | 914 |
| Long-Felt Want and Commercial Success | 916 |
| Infringement of Patent 2,906,310 | 916 |
| Infringement of Reissue Patent 24,683 | 917 |
| Infringement of Patent 3,044,514 | 918 |
| Infringement of Patent 2,934,120 | 919 |
| Infringement of Patent 2,934,121 | 919 |
| Infringement of Patent 2,840,318 | 922 |
| Infringement of Reissue Patent 24,764 | 922 |
| U. S. History of Schnell's Patents | 925 |
| Description in Schnell's U. S. Patents | 925 |
| Prior Art Relied Upon by Defendants | 926 |
| Grinders | 929 |
| Colloid Mills | 930 |
| Icing Extruder, Mixer for Liquids and Pump for Oil Refineries | 930 |
| Garbage Disposal Devices | 930 |
| Garbage Disposal Device of Tranbarger Patent 2,594,250 | 931 |
| G. E. Garbage "Disposall" Device | 931 |
| Garbage Disposal Device of Hilliker Patent 2,421,064 | 932 |
| The Sewage Disintegrator of Rymann Patent 2,496,359 | 933 |
| Fodder and Beet Mill of Austrian Hortnagl Patent 179,437 | 933 |
| Defendants' Specially Constructed Machine of DX-149 | 933 |
| Schnell Is the Original, Sole and First Inventor | 933 |
| The Claims in Suit Cover Schnell's Inventions | 934 |
| Aggregation and Exhausted Combination Defenses | 934 |
| Double Patenting Defense | 934 |
| Intervening Rights Defense | 934 |
| Defense Asserting Importance of Decision by German Patent Office | 935 |
| The Maeder Defense | 935 |